IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


LAUREN ANDERSEN,                                      )
Plaintiff,                                            )        **CIVIL ACTION NO.**
                                                     )        **CV12-1049**
v.                                                   )        **(JFB) (ARL)**
                                                     )
the NORTH SHORE LONG ISLAND                          )        **DEMAND FOR**
JEWISH HEALTHCARE SYSTEM's                           )        **JURY TRIAL**
ZUCKER HILLSIDE HOSPITAL                             )
and                                                  )        **FOURTH**
JOSEPH M. SCHULMAN,                                  )        **AMENDED**
DR. ALAN J. MENDELOWITZ,                             )        **COMPLAINT**
DR. PAUL PANKAL,                                     )
DR. LYUDMILA KARLIN,                                 )
DR. HARSIMRAN BRAR,                                  )
DR. LAUREN HANNA,                                    )
NURSE CATHERINE AMES,                                )
NURSE SOOSAMMA KOMPANCARIL,                          )
NURSE ABRAHAM LOPEZ,                                 )
PSYCHOLOGIST SHVETA MITTAL                           )
JOHN and JANE DOES #1-10,                            )
the CITY OF NEW YORK,                                )
comprising the New York Police Department "NYPD" and )
the Fire Department of New York's Emergency Medical  )
Services "FDNY-EMS", and individual employees:       )
NYPD Detective Michael T. O'BRIEN,                   )
and NYPD Lieutenant Antoinette PETRUZZELLO,          )
and John Doe FDNY-EMS technician known as "Frank 50")
and
the PORT AUTHORITY OF                                )
NEW YORK AND NEW JERSEY,                             )
and John Doe officer known as "P.O. CORWIN 2524",    )
and "T.C. CARBONARO",                                )
and Jane Doe officer known as "LIANTONIO",           )
and Lt. Michelle SERRANO,  and                       )
UNITEDHEALTH GROUP, INC.,                            )
DEFENDANTS.                                          )

## FOURTH AMENDED COMPLAINT

## I. Introduction

1.     This is a civil rights action by plaintiff Lauren Andersen for damages under 42 U.S.C. § 1983, the ADA and Rehabilitation Acts, and state tort laws, against North Shore Long Island Jewish ("NSLIJ") Healthcare System's psychiatric center, called Zucker Hillside Hospital ("the Hospital" or "HILLSIDE"), Joseph M. Schulman ("Schulman"), the Executive Director of HILLSIDE, Dr. Alan J. Mendelowitz ("Mendelowitz") and Dr. Paul Pankal ("Pankal"), physician managers, Dr. Lyudmila Karlin ("Karlin"), attending psychiatrist, Dr. Lauren Hanna ("Hanna"), resident, Catherine Ames ("Ames"), head nurse, Soosamma Kompancaril ("Kompancaril" or "Susie"), head nurse, Abraham Lopez ("Lopez"), nurse, and Dr. Shveta Mittal ("Mittal"), psychology fellow, at the Hospital's "3 Lowenstein" or "3 Low" unit of HILLSIDE, and Dr. Harsimran Brar ("Brar"), resident at HILLSIDE's psychiatric emergency room arising out of the unlawful imprisonment, physical assault, forced stripping, forced injection of unwanted medication, and additional egregious forms of persecution of the Plaintiff, Lauren Andersen, a woman with a history of rape and PTSD (Post Traumatic Stress Disorder) from emotional and physical trauma.

2.     The Port Authority of New York and New Jersey Police ("PAPD"), and its employees Lt. Michelle Serrano, John and Jane Doe officers known as "P.O. Corwin 2524", "T.C. Carbonaro", and  "Liantonio", and the City of New York, encompassing the FDNY's Emergency Medical Service ("EMS") and its John Doe employee "Frank 50" and the NYPD, and its employees Detective Michael T. O'Brien ("O'Brien"), and Lieutenant Antoinette Petruzzello ("Petruzzello"), aided and abetted the above Defendants to deprive the Plaintiff of her Constitutional rights to freedom of speech, freedom to reject antipsychotic medications, due process, privacy and freedom from unreasonable search and seizure, freedom from cruel and unusual punishment, and right to bear arms.  The Plaintiff also alleges violations of the ADA and Rehabilitation Acts by all of these entities and individuals.  The individual Defendants all participated in the harm against the Plaintiff, motivated by ill will, and custom and practice.  She further alleges negligence, gross negligence, battery, false arrest, unlawful imprisonment, intentional infliction of emotional distress, negligent retention, prima facie tort, negligent hiring, retention, and supervision of employees and agents, which are actionable under the laws of the state of New York.

3.     The forced stripping and forced drugging were perpetrated on two separate occasions by several male and female Hospital nurses and/or mental health workers under the supervision of the Defendant physicians and nurses, who alleged that they were permitted to do this by the Hospital's automatic disrobement policy, which allegedly allows forcible stripping of patients who refuse a request to disrobe.  No information has yet been made available about whether the Hospital also has a policy of forcible injection.  The Defendants and various other members of staff at HILLSIDE committed the additional violations of the Plaintiff's rights on various occasions during the Plaintiff's incarceration at the Hospital.

4.     Ms. Andersen was physically injured, emotionally devastated, and became further depressed and anxious as a result of the treatment she received at HILLSIDE. Although Ms. Andersen went to the Hospital's Psychiatric Emergency Department voluntarily for what she believed was clearance to travel to the United Kingdom, she was involuntarily detained for eighteen days during which time she was physically and emotionally abused in a variety of sadistic ways.  The Defendant physicians refused to honor Ms. Andersen's repeated requests for discharge or transfer to another hospital.

5.     This aggressive treatment was administered despite the Plaintiff having informed Hospital staff in writing in advance of her history of rape, emotional trauma and physical disabilities, and HILLSIDE acknowledged having received this written record.

6.     This action is brought against the Defendant entities and individual defendants for:

a.     injunctive and declaratory relief and compensatory damages under the New York Human Rights Act;

b.     compensatory and punitive damages for Constitutional law violations under 42 U.S.C. §1983, and conspiracy under 28 USC § 1343,

c.     compensatory and punitive damages under state tort laws for negligence, gross negligence, battery, false arrest, unlawful imprisonment, intentional infliction of emotional distress, negligent retention, *prima facie* tort, negligent hiring, retention, and supervision of employees and agents;

d.     compensatory and punitive damages under state tort actions for medical negligence and malpractice in the exercise of medical judgment;

e.     compensatory and punitive damages under New York General Business Law, Consumer Protection from Deceptive Acts and Practices, false advertising and deceptive trade practices;

7.     Plaintiff seeks total monetary damages in an amount to be determined at trial.

8.     Section 33.14 of the NYMHLs deals with sealing of records pertaining to treatment for mental illness. "The court may order that the petitioner's records be sealed, subject to such limitations or exceptions as the court may impose, upon a finding that… the petitioner was illegally detained by a facility by reason of fraud, error or falsified documents, and the records pertain to such illegal detention."  The Plaintiff requests that the Court order her clinical records to be sealed.

## II. Parties

1.      Plaintiff, Lauren Andersen, is a citizen of the State of New York.  She resides in Nassau County.  Ms. Andersen is a 50-year-old Caucasian woman, with a history of psychiatric and physical disabilities.

2.      Defendant, Zucker Hillside Hospital ("HILLSIDE"), a part of the North Shore Long Island Jewish healthcare system, is located at 75-59 263rd St., Glen Oaks, NY 11004.

3.      Defendants Joseph M. Schulman, Dr. Alan Mendelowitz, Dr. Lyudmila Karlin, Dr. Paul Pankal, Dr. Harsimran Brar, Dr. Lauren Hanna, Nurse Catherine Ames, Nurse Soosamma Kompancaril, Nurse Abraham Lopez, and Psychologist Shveta Mittal who, upon information and belief, currently reside in the State of New York. Upon information and belief, at all times relevant, these Defendants were employed by HILLSIDE and maintained their principal place of business at the Hospital.

4.      Defendant, The Port Authority of New York and New Jersey, encompassing the Port Authority police department (PAPD), is headquartered at 241 Erie Street Room 302, Jersey City, NJ 07310.  Upon information and belief, at all times relevant, the individual Defendants Carbonaro, Corwin and Liantonio were employed by PAPD and maintained their principal place of business at this address.

5.      Defendant, The City of New York, encompassing the NYPD and FDNY Emergency Medical Services (EMS), and the Queens DA, is c/o City Hall, New York, NY 10007.  Upon information and belief, at all times relevant, the individual Defendants NYPD Det. Michael O'Brien and Lt. Antoinette Petruzzello, and John Doe EMS technician known only as "Frank 50", and were employed by the City of New York.

6.      Defendant, UnitedHealth Group Inc. ("UHG"), parent company of United Healthcare, is headquartered at 9900 Bren Road East, Minnetonka, Minnesota 55343. The company administers manages care plans in New York State that process fees from hospitals like NSLIJ's for reimbursement by Medicaid and Medicare.

## III. Jurisdiction

This court has jurisdiction over this action and Defendants under the provisions of 42 U.S.C. §12188(a), 42 U.S.C. § 1983, and 28 U.S.C. §§1331 and 1343. It has supplemental jurisdiction over the state claims under 28 U.S.C. §1367, as these claims arise from the same set of facts and circumstances and form part of the same case or controversy which give rise to the federal claims.

Venue is proper under 28 U.S.C. § 1391(e)(2) because the events giving rise to the Plaintiff's claims occurred in this judicial district, and Plaintiff and Defendants reside in or maintain their principal place of business in this district.

## IV. Facts

1.      Plaintiff is a 50 year old woman with psychiatric disabilities stemming from a rape experience that occurred in her twenties, and extreme stress from work, personal life and a problematic medical history.  Plaintiff has suffered from severe depression, and has a history of self-injury stemming from these experiences, having attempted suicide via an overdose in 2001.  However, she had not made any attempts or threats of self injury in the decade prior to her hospitalization at HILLSIDE.

2.      The Plaintiff also has physical disabilities from having undergone a total proctocolectomy (removal of the entire colon and rectum) in 2005 due to a genetic condition known as Adenomatous Polyposis, and having undergone major spine surgery in 2008 to remove a large meningocele (cyst in the spinal column) that left her with an eggshell-thin, delicate sacrum (base of the spine).

3.      Plaintiff is an individual with a disability under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act because her psychiatric and physical impairments limit major life activities, including concentrating and working.

4.      Prior to HILLSIDE, Plaintiff had never been in a locked psychiatric facility; her only previous hospitalization in a psychiatric facility had been a voluntary one, in an open unit with no locked wards, at the well-known Priory Hospital in London.  That inpatient stay was for severe depression, and occurred seven years previously in 2004.

5.      In two decades and inpatient stays in several hospitals, Plaintiff has never injured or threatened to injure herself or anyone else while in a hospital setting.  Before her arrival at HILLSIDE, she had never previously been forcibly stripped of her clothing or involuntarily injected in any other hospital.

### Illegal forced admission of the Plaintiff to HILLSIDE

6.      Plaintiff was an inpatient at Zucker HILLSIDE Hospital (part of the Long Island Jewish system) for eighteen days in June 2011, admitted after having attempted to buy an airline ticket to the UK from British Airways at JFK (John F. Kennedy airport) without a passport. Hospital staff categorized this as "delusional", however Ms. Andersen has dual citizenship and her son had recently traveled to the UK without a passport so she thought she would also be able to do so as well.  She is very familiar with the UK, having lived there previously for twelve years.  She had credit cards to pay for the flight, and several other forms of identification including her British Certificate of Naturalisation.  She had places to stay in London and Scotland, and wanted to see her teenage son (aged eighteen at the time) who was attending school in Scotland.  She had business to attend to, as she was co-founder and Chairman of a British medical technology company.

7.      The Plaintiff requested to speak to the press about her objections, and British Airways staff called the Port Authority police.  The law enforcement officers who arrived (including Officers known as Liantonio and Corwin, reporting to Tour Commander

Carbonaro, according to the police report) told her that if she didn't want to go home, she could be cleared to travel and would be able to speak to the press at the Hospital, so she agreed to go. She believed them, because her family had raised her to trust the police, and she had not seen any other reason not to trust them. Despite her calm agreement to accompany the officers, they handcuffed her, saying that this was part of their standard operating procedures while waiting for EMS. The Plaintiff's voluntary decision to go to a psychiatric hospital metamorphosed into a Hobson's choice and an act of coercion by the police. If she had known this was going to happen, she would have gone home. She asked for, but was denied, a drink of water without explanation by the officers, after having told them of her physical disability (lack of a colon), which causes her to become easily dehydrated and therefore uncomfortable. The Plaintiff then became quietly tearful, because she felt she was being treated unfairly, had never before been handcuffed, and she felt this was an injustice after she had already agreed that she would go willingly. However, she was too intimidated by the armed law enforcement officers to object further.

8.     When EMS arrived, two PAPD officers confiscated the Plaintiff's handbag and suitcase, and escorted her in the ambulance. She again calmly asked them to remove the handcuffs, which were uncomfortably tight, but they refused, saying that it was part of their standard operating procedures.

9.     After the doors of the Hospital were locked behind the Plaintiff, some time passed with the Plaintiff waiting while still wearing the handcuffs, and meanwhile one or more of the PAPD officers had conversations with people believed to be nurses and doctors employed by HILLSIDE, openly collaborating with them about further detention of the Plaintiff. Representatives of HILLSIDE and PAPD willingly assisted each other in denying her the opportunity to speak to the press as she had requested, illegally imprisoning her, and interfering with her Constitutional rights. The PAPD officers then removed the handcuffs. A uniformed officer, believed to be one of the PAPD, remained in the ER with the Plaintiff.

10.    Plaintiff did not want to be treated as an inpatient, but preferred to continue her normal program of outpatient care, so this was an involuntary admission. The doctor who did the admission from the psychiatric emergency room on June 12th, 2011 was psychiatric resident Dr. Harsimran Brar.

11.    Plaintiff says: "If I had known I could be handcuffed, deprived of drinking water, that HILLSIDE's wards were locked, and that I could be kept there involuntarily, I absolutely would NOT have gone there. I must be the most gullible person in the world to have done so. Even after I had been at the Hospital for several hours they failed to mention that they could detain me involuntarily. I wasn't carrying any weapons or contraband, I was not under the influence of alcohol or illicit drugs, I hadn't even taken the wrong dose of my usual medication, I committed no crime, and I wasn't disturbing the peace; in fact, the worst thing I did was to park my car in the wrong place."

12.    Plaintiff was in the midst of a stressful, lengthy divorce from an abusive alcoholic

husband, which was putting her under severe financial and emotional pressure, and she had left the family home with her young son (aged seven at the time) a few days previously to live with her parents. Her parents' house had flooded during the night and she had awakened to two inches of water throughout her living quarters, which was alarming and distressing. Plaintiff was annoyed with her mother for hiding the former's US passport; her mother did not want her to go to the UK, for personal reasons. These factors all contributed to the Plaintiff's anxiety on that day, which was then heightened by being trapped at HILLSIDE. The fact that Plaintiff was a woman who had recently undergone such emotional turmoil at home made HILLSIDE'S abusive acts that much more despicable.

13.     The ritual humiliation and maltreatment that would characterize Plaintiff's entire stay at HILLSIDE began in the emergency room. A Jane Doe worker asked Plaintiff to remove her clothes and put on Hospital gowns in private, saying that this was standard operating procedure, which she did voluntarily. She was coerced into signing a document saying that the Hospital would not be responsible for her personal possessions, and then a Jane Doe worker confiscated her possessions over her objections. She was locked for hours in the emergency room and, again, was not even allowed a glass of water, after having told the staff of her physical disability, which causes her to become easily dehydrated. She was secluded in a tiny examination room from which she was not allowed to leave. Keeping the Plaintiff behind locked doors without water prior to admission constituted unlawful imprisonment and intentional infliction of emotional distress (IIED).

14.     After several hours of interrogation and waiting in the ER, Plaintiff was exhausted and very keen to leave. Dr. Brar had led her to believe she would be allowed to go home with her family, who had arrived and were waiting with her in the ER. They had agreed that she would go home with her aunt, since her living quarters has been flooded and were still soaked. Instead, Dr. Brar told the Plaintiff that she would be kept "overnight" to adjust her medications, and wrote in the medical records "patient is currently refusing inpatient admission".

**Plaintiff further detained against her will, illegally**

15.     Neither Dr. Brar nor any other Hospital staff member explained to Plaintiff what law they were invoking to detain her involuntarily, which delayed her in bringing suit against HILLSIDE. She did not learn from the Mental Hygiene Legal Service until seven months after discharge that this was New York State Mental Hygiene Law § 9.39: Emergency admissions for immediate observation, care, and treatment. However, the Plaintiff did not fulfill either of the two criteria for admission under § 9.39 – danger to oneself or danger to others. This is made crystal clear in Brar's Mental Status Exam. In fact, the Plaintiff would not even have met the criteria for Assisted Outpatient Treatment, which is a less restrictive form of involuntary mental health treatment than hospitalization (New York State Kendra's Law, MHL § 9.60).

16.     Plaintiff had been by any reasonable definition *compos mentis* on June 12th 2011, before she was arrested; she had packed her bags with everything she needed to go to the UK, driven her young child to her sister's house, and driven herself safely to the airport. She was dressed appropriately and neatly, as noted in the admission report.  She was coping admirably well considering the inhuman levels of stress that she was enduring.

17.     HILLSIDE never served Plaintiff with written notice of her status, which is required under § 9.39.  In fact the only document in the medical records that indicated that a § 9.39 was applied was a form filled out by an unidentified person with an illegible signature the day after the Plaintiff's admission listing a pile of documents that were never given to the Plaintiff, with "Pt 939" on the patient signature line.  This fateful and damaging decision constitutes negligence, malpractice in the exercise of medical judgment and false imprisonment on the part of Brar and HILLSIDE.  Joseph M. Schulman, as the Executive Director of HILLSIDE, is ultimately responsible for this catastrophic decision.

18.     Plaintiff states bitterly, "I wasn't even treated like a human being.  It was as if they were checking a dog into a kennel.  Even violent criminals being checked into a prison are treated with more respect."

19.     The "overnight" admission was later revealed to be false pretenses.  Despite describing the Plaintiff in the medical records as cooperative and non-dangerous, a Jane Doe worker confiscated all of Ms. Andersen's possessions at that time (except her underwear), including her handbag and her duffle bag, and all of their contents including Macbook (laptop), iPad, iPhone, pens, books, toiletries, medications, belt, most of her clothing, jewelry, shoes, keys, money and scarf.  She had absolutely nothing in her possession in the Hospital that could remotely be considered dangerous. This was a violation of the Plaintiff's rights to freedom of speech and from unreasonable search and seizure.  She was frogmarched by two John Doe uniformed security guards and/or police officers from the emergency room to a car, was driven to another building, then led across a parking lot to a locked psychiatric ward (called "3 Lowenstein" or "3 Low").  NB: during this entire time including walking outdoors she was humiliatingly attired in nothing but a Hospital gown, panties and socks.

20.     Plaintiff was not unwell enough to be kept as an inpatient at HILLSIDE, but the Hospital's staff insisted on incarcerating her – there is evidence that this was for commercial and probably political reasons.  There is evidence that she was kept there because her insurance was willing to pay the Hospital for it, not because she needed to be hospitalized.  She was not discharged until the insurance ran out eighteen days later.

21.     Not only did HILLSIDE fail to serve Plaintiff with written notice of her status and rights at admission, but they also failed to do so again after 48 hours, which is required under § 9.39. The damaging decision to further detain the Plaintiff after 48 hours constitutes negligence and malpractice in the exercise of medical judgment on the part of all the defendant psychiatrists and further unlawful imprisonment by HILLSIDE.

22.     Plaintiff asked repeatedly during the course of her eighteen day stay to be discharged (this is corroborated by the medical records); she even asked her physicians what conditions she needed to fulfill in order to be discharged, which they belatedly gave her, but they refused to discharge her even after she had fulfilled all of their requirements. In desperation, she called United Healthcare to try to cancel her medical coverage so that the Hospital would be financially motivated to discharge her, but the insurance company told her she would have to personally visit their office to do so, and the Hospital would not allow her to go.

23.     Plaintiff says: "The psychiatrists pried into every aspect of my personal life, and when I refused to talk about a sensitive subject they criticized me as uncooperative and used that as an excuse to keep me in the Hospital even longer."  This was a violation of the Plaintiff's privacy rights under New York State tort laws and New York State Title 14 (14 NYCRR 27.8).  She adds "Certain subjects were private or painful to discuss, and in some cases I'd already told all the other shrinks about a topic and didn't want to repeat the story again – it's the emotional equivalent of being repeatedly stabbed with a knife. HILLSIDE's clinical records are unlike any psychiatric records I have ever seen; the staff recorded details that I consider personal and private and were not at all medically relevant.  It seems in retrospect that they were trying to record personal information that I would likely be too embarrassed to have revealed in court.  As soon as sensitive information is put into written form, the risk emerges that such information might fall into the wrong hands.  With clinical records, it is worse than a violation of privacy rights; it is also a deprivation of due process, if the hospital records sensitive information, but then refuses to allow the patient to edit or comment on those records."

24.     HILLSIDE detained Plaintiff the maximum period for which United Healthcare agreed to pay, then discharged her on the last reimbursable day (corroborated by a letter from United Healthcare dated August 23rd, 2011).

### Plaintiff denied mandatory legal advice and hearing

25.     Hanna, the psychiatric resident, admitted in the clinical records that Ms. Andersen was "stating she has done everything stipulated of her to be discharged and staff will not tell her what else she has to do for discharge" and quoted the Plaintiff as saying "until anyone can give me a clear explanation of what I have to do to get out of here I don't see why I should cooperate."  The professional thing to do would have been for Hanna to provide Ms. Andersen with concrete goals for discharge after recording that statement from the Plaintiff, but this did not happen.  Hanna, whom Ms. Andersen describes as particularly arrogant, patronizing and unsympathetic, also noted in her records (which are full of errors and defamatory statements) that Ms. Andersen had "endorsed a desire to testify and have news cameras present during her medication over objection hearing", however HILLSIDE never granted a hearing of any kind.  Patients have the right to demand a hearing to be discharged under NYS Mental Hygiene Law Title 14 Section 27.8 & 27.9, but Ms. Andersen was not granted this opportunity.  This was also a violation of her constitutional rights both to due process and to freedom of speech.  Ms. Andersen heard that several other patients were granted hearings during her tenure at

HILLSIDE but she was not, so this treatment was discriminatory, and probably retaliatory.

26.     Plaintiff was quoted in the medical records as saying that she asked for but was not granted hospital internal review of her objections (which she requested on several occasions), let alone any external review by a court. Hospital staff ignored all of her complaints and requests for hearings (internal and external), despite documenting that she did in fact ask for a hearing. The Defendants provided no explanation as to why they ignored these requests.  The Plaintiff also attempted to complete the administrative review by OMH, OPMC and CQCAPD after discharge, but this was too late to enable her to be discharged quickly and thereby prevent most of the physical and psychological injuries inflicted on her.

27.     Defendants pointed out a telephone number posted on the wall for a Hospital advocate to discuss patients' legal rights and to help resolve the situation, but nobody at the number returned phone calls despite several messages from the Plaintiff.  Since there were no private phones, she had to call the Mental Hygiene Legal Service ("MHLS") from the public pay phone, which was a violation of the Plaintiff's right to privacy under New York State tort laws and Title 14 (14 NYCRR 27.8).  She did speak with an Andrew Murray, whom she believed to be employed by MHLS, who said he would ask the lawyer Brian Wellington ("Wellington") to meet with her.

28.     Plaintiff asked Dr. Karlin for a copy of the New York State Patients' Bill of Rights but Dr. Karlin refused, so on June 13th 2011 Ms. Andersen removed the laminated copy that was posted on the wall in the cafeteria, wrote on it with an erasable pen and showed it to the staff (corroborated by Hanna's clinical records) to demonstrate how many of her rights had been violated – twelve out of a total of nineteen.   A staff member, "Collin", tore the Bill of Rights out of her hands and stuck it back on the wall.  Karlin finally gave Ms. Andersen a copy of the Bill of Rights, on which the Plaintiff made notes about HILLSIDE's violations and then handed it back to Karlin for inclusion in the Plaintiff's medical records.  Karlin failed to include this document in the Plaintiff's clinical records, and still no legal consultation was forthcoming.

29.     Although attorney Wellington did not arrive, Dr. Hanna, the psychiatric resident, gave Plaintiff unsolicited legal advice, criticizing her plan to publish another book under her own name and advising her against it.  The Plaintiff's first book was a 2009 controversial memoir written under the pseudonym Fiona Cross, called *"Spooked: Fear and Loathing on Capitol Hill" (*ISBN-13: 978-1449025816, sold on Amazon.com in the US and several other countries).  Among other things, the book chronicles the Plaintiff's insider view of the machinations of a powerful Washington lobbying group, and is critical of the Obama administration's ideology.  Plaintiff had also mentioned the book to Dr. Brar, and its title was included in Brar's admission report in the first paragraph.  The Plaintiff emphasized that she considered the book an important part of her medical records but Brar implied that she did not read it.

30.     Hanna described Plaintiff in the clinical records as saying that the Plaintiff plans

"to publish another book with her real name" and Hanna admitted having "counseled patient to consider seriously [not] using her real name given she has been threatened with legal action in the past regarding her first book." Ms. Andersen says: "why did Hanna advise me not to publish another book under my own name?  Is she a lawyer as well as a psychiatrist?  Or was that a threat handed down from somewhere up the political chain?"  This was a violation of Section 6530 of the New York State Education Law, clauses 17 (undue influence on the patient), 20 (moral unfitness), 24 & 26 (unauthorized services), and 31 (willful abuse/intimidation).  Section 6530 may not provide a private cause of action, but it worth mentioning because it is indicative of what the standard of psychiatric care is supposed to be.  Hanna is a trainee psychiatrist and should not have been giving the Plaintiff legal advice.  This is another example of HILLSIDE's improper training and inadequate supervision of its staff.

31.    In fact, attorney Wellington failed to arrive to meet the Plaintiff until June 29th, 2011, the same day Plaintiff wrote to her U.S. Congressman, Pete King, and sent an email to Tom Strong, an editor at the Associated Press with whom she also spoke on the phone.  She had also talked to a reporter at Newsday, and left messages for editors at the New York Times and the Wall Street Journal in the few previous days.

32.    However, by that time it was too late for attorney Wellington to do anything to ameliorate the situation because the damage had been done in the previous seventeen days, and the staff scheduled the Plaintiff to be discharged the next day (possibly in response to her press and political correspondence).

## Wrong symptoms, incorrect history, botched diagnosis

33.    The clinical records are littered with inaccuracies, inconsistencies, exaggerations and misinterpretations of the facts.  This was due either to incompetence, or malice by the staff, or intentional dishonesty to support their decision to detain Plaintiff.

34.    For example, Brar stated in her admission report "patient has been overwhelmingly stressed staying with her verbally and now physically aggressive husband".  However, on the following page, Brar then responded "no" to the questions about physical and sexual abuse, which is an obvious contradiction, given that she had just written about the Plaintiff's recent experience of spousal abuse.  Plaintiff points out that Brar was negligent if not incompetent under NYS Education Law Section 6530.  Dr. Brar is only a resident (i.e., trainee) and was insufficiently experienced to make the decision to detain the Plaintiff.

35.    In another example, Brar alleged that Plaintiff has a "past history of mania" and "a history of Bipolar disorder".  Plaintiff says: "None of my psychiatrists over the years had ever previously told me that they thought I was bipolar or manic, only that I was suffering from depression and anxiety.  HILLSIDE only requested my records from the previous year, which my psychiatrist Dr. Kirschen did not provide; they did not reach him on the telephone and they couldn't be bothered to try again.  Brar knew that, and lied about my medical history."

36.     The Plaintiff firmly denies that she was "very impulsive", "manic", excessively paranoid, or that she benefited at all from inpatient admission.  These are all exaggerations and misrepresentations of the facts to attempt to retroactively justify the Defendants' illegal decision to commit Ms. Andersen.  More importantly, even if a patient had these symptoms, none of them would be sufficient to justify a § 9.39 admission.  The admission report was the proverbial "scalpel left behind."  It was HILLSIDE's own "Heffalump trap"[1].

37.     Plaintiff says, "Frankly, it doesn't matter what my diagnosis was; I only mention that to illustrate HILLSIDE's incompetence.  In America, the Constitution gives you the freedom to be as mad as a March hare if you want to be, wear a tinfoil hat, bark at the moon, or just be a pain the neck (as long as you don't disturb the peace)... but a mental hospital can't legally detain you against your will if you are not posing an imminent, serious, physical danger.  Danger of reputational damage or any other kind of threat is irrelevant."  Comments that Ms. Andersen made sarcastically were also noted in the clinical records as if they were statements of fact.

38.     She says: "Brar alleged in admission reports that I was 'manic' but I was also described as 'calm and cooperative' with no signs of anxiety, which is impossible – the two are mutually exclusive.  Brar said her reason for admitting me was because I was 'impulsive' and 'not on appropriate meds', but is that an appropriate reason to lock someone up in an insane asylum instead of suggesting that they be treated as an outpatient? Certainly not!  In fact, Brar overrode my outpatient psychiatrist's prescribed medications against my will.  She prescribed – over my objections – Seroquel®[2], a medication that I had tried in the past, and found its side effects unpleasant.  In fact, they increased the dose too high, to the point where I felt, in one terrifying episode, that I was having a heart attack.  They documented this in the records.  The only reason I took the Seroquel was because they led me to believe that they would let me out of the hospital more quickly if I did.  That turned out to be yet another bait and switch tactics."

39.     The Plaintiff adds: "My going to the UK reportedly seemed impulsive to the shrinks at HILLSIDE, but I had been thinking about it for weeks and I had decided to do something for myself for a change.  Yes, I used to be a CEO, but I'm also a divorced mother of two whose life revolves around her children, who plays Lego and Minecraft, and even tries to learn Wii games when they aren't being dominated by a bunch of overactive boys.  I drive a scratched-up soccer mom van with big apple juice stains and chocolate smears on the carpets."

40.     Plaintiff says: "Brar relied heavily for her decision to admit me on what my 79-

---

[1] The "Heffalump trap" (i.e. elephant trap), was set by Winnie-the-Pooh and Piglet; it is a metaphor for a trap that is set to catch an opponent but ends up catching the person who set the trap – as happens to Winnie in "The House at Pooh Corner" ….

[2] Seroquel is a brand of quetiaine, an atypical antipsychotic produced by AstraZeneca.  Ms. Anderson experienced its side effects such as dizziness, drowsiness, tremors, confusion, uneven heartbeats, and trouble swallowing.

year-old mother was telling her, but my mother (1) is not a psychiatrist, (2) was not familiar with my entire medical history, (3) did not know about everything that was going on in my personal and professional life, (4) was biased by her own personal issues, and (5) had unwisely hidden my passport.  Furthermore, I am a 50-year-old adult, not a minor.  It is not the purview of a psychiatrist to get in the middle of family squabbles."

41.     HILLSIDE psychiatrists never revealed Ms. Andersen's diagnosis to her even when asked; this violated her right as a patient to know her diagnosis.  She later found that the clinical records are inconsistent on this subject.  In some places it is listed as "Bipolar 1", in others "mixed episode".  This diagnosis was based on exaggerations and misrepresentations of the facts.  In order to be considered bipolar, a patient must alternately suffer from both depression and mania.

42.     When Mendelowitz arrived to meet with the Plaintiff many days later, he told her he thought she was "manic".  She says: "I certainly wasn't manic; that was a figment of his imagination.  I was no more manic than he was.  The symptoms of mania are expanded self-esteem; elevated mood; reduced need for sleep and excess energy; excessive talkativeness; racing thoughts; and overindulgence (e.g., in food, sex, alcohol or spending).  I didn't exhibit any of those symptoms.  I was not excessively talkative; the clinical records show that I was reticent and guarded in speaking to the shrinks.  I didn't have a reduced need for sleep or elevated mood; on the contrary I was unhappy and reported that I was sleep-deprived due to stress.  I didn't have a partner so I certainly wasn't overindulging in sex.  Furthermore, manic patients frequently stop taking their medications because they feel so good they think they don't need the pills, but I felt bad and had not gone off my meds.  My credit card bills at the time demonstrate that I wasn't overindulging in anything else.  The shrinks asked me if my thoughts ever raced and I said it wasn't happening at that time but I think everyone's thoughts race a bit when they are under a lot of stress; it's a common symptom of anxiety.  They noted my irritability in the records as if it were a sign of mania, which is also absurd; I was irritable and angry because they were detaining me there against my will!"

43.     The admission process – in addition to violating the Plaintiff's constitutional rights – evidenced negligence, if not gross negligence and incompetence, under NYS Education Law Section 6530; violated NYS General Business Statutes relating to deceptive acts and false advertising, and NYS tort law pertaining to false imprisonment. There were also several violations under NYS Mental Hygiene Law Title 14, and as previously mentioned NYS Mental Hygiene Law section 9.39, not to mention violations of the NYS Patient's Bill of Rights, codified as Public Health Law section 2803(1)(g), and 10 N.Y.C.R.R. sections 405.7, 405.7(a)(1) and 405.7(c).

## Justifiable apprehension, not delusions

44.     The Plaintiff says: "It is disgusting that HILLSIDE has tried to vilify me by classifying me in the medical records using the offensive term 'delusional'.  I can present substantial evidence that their arguments for labeling me with this symptom were false.   They should have checked the facts.  'Delusional' appears to be HILLSIDE's catch-all

symptom that it uses to try to discredit patients and thereby protect itself from liability in case patients challenge the treatment they received in the Hospital.  Like Dr. Martin Luther King, Jr., I consider myself to be 'creatively maladjusted', not delusional."

45.     The Plaintiff's clinical records from her outpatient psychiatrist (whom she had been seeing for a year) just prior to admission confirm that her thinking was not delusional at that time.  In fact, she was never described in his medical records as delusional, manic or bipolar.

46.     In another example, HILLSIDE staff considered it delusional to try to leave the country without a passport, but Plaintiff had valid reasons for having done so.  As previously mentioned, she has dual UK/US citizenship and her son had previously traveled to the UK without a passport so she thought she would also be able to do so.

47.     The last of HILLSIDE's assumptions for labeling Plaintiff "delusional" was her concern that the "government is watching her".  For various reasons, it's obvious that the government is in fact observing her and it isn't a "grandiose idea".  For example, her mother was the personal physician to a former head of the CIA, William Casey (this is in the Plaintiff's book).  She was in the process of doing a consulting project for Britain's Duke of York (Prince Andrew)…. ..  Most importantly however, she produced a significant report in 2009 for Tim Geithner, U.S. Treasury Secretary, who is a contemporary of Ms. Andersen's from Dartmouth College.  The document is still being treated as confidential for the time being, and she did not discuss it with the staff at HILLSIDE for this reason.

48.     Ms. Andersen says: "I don't care whether the government is watching me, only whether is it trying to hurt me or my family.  Given the way in which I was treated at HILLSIDE, I had good reason to believe that the surveillance was malevolent.  I was justifiably wary.  Wouldn't you be if you'd submitted a well-researched report to the U.S. Treasury Secretary in 2009, which could have him gored by the media if he mishandles it, you reminded him about it critically in April 2011, then two months later you get stopped for nothing more than trying to buy an air ticket, and locked in the gulag against your will, whose staff physically attack you twice?  I think most people would be suspicious if not paranoid about that!  It's something out of the former Soviet Union or the Chinese Cultural Revolution, not modern day America.  Furthermore, wariness is not in and of itself a sign of mental illness, and there is a gray area between suspicion and paranoia.  Suspiciousness is baseline (i.e., normal) for me, which is obvious if you read my book, and it is well justified because of my history.  The arrogant shrinks at HILLSIDE who had just met me were so quick to call me paranoid but did not know me well enough to make that judgment… but at least they admitted that I was never dangerous."

49.     The Plaintiff adds: "Furthermore, as Andrew Grove, the renowned former CEO of Intel, titled his 1996 book, 'Only the Paranoid Survive.'"

## Buckingham Palace visit was reality, not a delusion

50.     Plaintiff says: "The staff at HILLSIDE laughed when I said that I intended to go to Buckingham Palace, and not as a tourist.  They jumped to conclusions and dismissed everything I told them as a delusion.  It may have been ambitious, but it wasn't delusional.  Two weeks after discharge (July 13th 2011) I did in fact go to the Duke of York's office at the Palace for a meeting, that was principally about developing a mentoring program to encourage entrepreneurship in the UK, a topic which is of interest both to me and to the Duke.  Truth is stranger than fiction.  Would a delusional person get through the security checks to be able to do that?  If I had been 'barking mad' (to use a British expression) when I was there in July would they have invited me back in September?"

51.     The Plaintiff adds bitterly: "Maybe HILLSIDE was inventing a new definition of 'bipolar', insinuating that if you are incarcerated in a dirty mental hospital and subsequently go to Buckingham Palace within the space of two weeks, it is a bit like going from the gutter to the top of the world, so you must be 'bipolar'.  Or perhaps that is just the way the Obama administration does security checks for Buckingham Palace: they imprison you for a few weeks in a concentration camp, tear your clothes off and stab you to see if they can incite you to violence.  And if you don't go ballistic, they give you security clearance.  I wonder how the Queen would feel about that; Her Majesty might say, 'We are not amused.'  I wonder how the American public would feel about it too; this could be an interesting topic for national debate, given that mental health is now in the public eye.  If that is how the system works I would have gladly foregone the visit to the Palace."

## Evidence of Plaintiff's sanity and credibility

52.     The Plaintiff attempted to talk to the press about the events leading to the publication of her book, and those that had taken place since, on June 12th, 2011, and the police and HILLSIDE acted in concert to detain her illegally.

## Unsafe conditions causing emotional distress

53.     There were dangerously mentally ill patients on the same unit at HILLSIDE who consistently caused Plaintiff to feel unsafe there.  However, her complaints about feeling unprotected were ignored by the Hospital, which was therefore guilty of negligent supervision.  Various members of staff at HILLSIDE also violated tort laws pertaining to IIED by repeatedly placing her in fear of physical injury.

54.     In the room next to Plaintiff's during part of her stay was a young man called "Daniel" who was obviously considered to be violent; he was strapped to his bed with thick leather restraints and two security guards (very large, intimidating male mental health workers) were stationed at the door twenty-four hours a day.  Being located next to this sideshow was in and of itself distressing to the Plaintiff.

55.     Several of the seriously ill patients (e.g., "Lorenzo Nevers") regularly paced the halls while talking loudly to the voices in their heads, which was frightening to Plaintiff. Lorenzo would also loom over her while she was on the telephone, eavesdropping and talking at an elevated volume to himself when she was trying to have a conversation.  She complained about this to HILLSIDE staff but these pleas were ignored.  An intimidating patient who called himself "Satan" tried to take her food and her seat on more than one occasion.

56.     Plaintiff was also repeatedly provoked by sexually aggressive patients, an anxiety-producing experience which HILLSIDE staff did nothing to prevent.  At one point a domineering patient ("Amanda Shannon") – who was muscular, about fifty percent bigger than Ms. Andersen, whom the Plaintiff and other patients believed was a lesbian – propositioned her and became hostile when the latter refused.   She had reportedly had her child taken away from her by social services.  She also threatened to punch Plaintiff in the face when the Plaintiff was allowed to use the computer for 15 minutes and she wasn't.  Plaintiff complained to Jane Doe employees that the belligerent woman should be kept under "CO" (constant observation), but they failed to respond to this request.

57.     Plaintiff was propositioned by another aggressive patient, called "Kelly", on a separate occasion, when the Jane Doe employees tried to install this patient in the Plaintiff's room as a roommate.  Kelly asked Plaintiff to go into the bathroom with her and became angry when the Plaintiff refused.  Kelly behaved in an alarmingly bizarre manner, and threw several of Plaintiff's belongings in the rubbish.  Ms. Andersen complained to head nurse Jessyca Berkman, who did not take the matter seriously.  They finally relocated Kelly after an anxiety-causing delay.

58.     These incidents and others contributed to Plaintiff's apprehension about being detained at HILLSIDE, and about the inadequate security in the Hospital.  She says: "It is anxiety-provoking for a person who has recently been traumatized by physical or sexual violence to be approached in a hostile and sexually aggressive way; whether the provoker is a woman or a man is immaterial.  It's about the violence, not the gender.  I think these patients were dangerous, and I should not have been forced to live on the same ward with them, let alone share a room with one.  It's bad enough to have to be around them during the day when they are not directly supervised, but to have to sleep a few yards away from them in a hallway with no interior bolts on the bedroom doors is frightening and hazardous.  Call me sheltered, but in the small town where I come from, adults don't threaten to punch each other."

**Irresponsible patient care**

59.     Plaintiff asked to see the head of the unit (Mendelowitz) repeatedly from the outset because she had been told on admission that he would be in charge of her care, and he was the chief of the unit, but was denied the opportunity to meet with him until many days later – this is substantiated by the clinical records.  The reporting structure at

HILLSIDE is believed to be as follows: the physicians in the unit report to Defendant Mendelowitz and all the other staff report to Pankal; the latter is also in charge of the plant and equipment.  Pankal and Mendelowitz report to Schulman.

60.     Plaintiff was only allowed to see the attending psychiatrist, a callous Russian with an ice-cold demeanor, called Dr. Lyudmila Karlin.  The Plaintiff told Karlin from the first meeting that she did not consider anyone qualified to treat her who hadn't read her book.

61.     Among other things, the book describes how Plaintiff was raped when she was in her twenties (see page 38 of the book) and endured a great deal of additional trauma.  She wrote her book with a certain amount of sarcastic humor to make it more entertaining for the reader, but the humor does not diminish the importance of the experiences described therein, which caused her a great deal of pain and anguish.

62.     One of the tenets of modern psychiatry is autonomy, i.e. that information sharing is voluntary, and the patient should only have to share personal information with her psychiatrist if and when she chooses to do so.     Plaintiff didn't want to re-live the traumatic experiences described in the book by discussing them over and over with all the numerous members of staff at HILLSIDE who were interrogating her.  She repeatedly asked various staff members to read the book, because each new staff member who approached her asked the same questions as the last ones had – which was harassment – and most of the answers were in the book.

63.     The Plaintiff gave Karlin a copy of the book, pointing out that it was only 150 pages long in large type and should not take more than an hour to read.  As Plaintiff points out, "That is less than half the length of my clinical records from HILLSIDE! Maybe I should have referred to it as a 'medical record' rather than as a book.  I wasn't asking them to read it for their entertainment, but to understand my medical history."  Karlin promised that she would read it, but claimed not to have done so for several days.

64.     Plaintiff also left a copy of the book at the nurses' station so that any staff member who hadn't read it could do so.

65.     As Mendelowitz himself smugly noted in the records on June 18th, Plaintiff became exasperated that he was meeting with her and had still not read her book, given how many times she had told him and other staff that its content was an important part of her medical history.  It was therefore negligent for him not to read it.  The Plaintiff asserts that if a patient submits a written document of reasonable length to her psychiatrist, she explains it is essential to her care, and she urges the psychiatrist responsible for her care to read it before treating her, that doctor has a professional obligation to read that document without delay.  It is a matter for discovery to find out what exactly Karlin and Mendelowitz consider their professional obligations to be.

**Forcible stripping incident**

66.     On June 14th, 2011, Plaintiff tried to escape from the Hospital by trying to climb

the chain link fence around the small outside area connected to the unit that was referred to as the "patio". Ms. Andersen was only able to get a couple of feet off the ground, because as she says, she is "frankly not strong enough to climb a fence, and it was more of a cry for help to be discharged than a genuine effort to escape." She never actually exited the unit at all, and since the fence was about 15 feet tall, she didn't even get close.

67. Several nurses and mental health workers pulled Ms. Andersen off the fence, and instead of discussing the escape attempt with her, they forced her indoors, and aggressively insisted that she take off her clothes and put on a gown. When she asked why she had to take off her clothes and put on a gown, they told her that this is Hospital policy if a patient tries to "go AWOL" (i.e. "Absent Without Leave").

68. Plaintiff asked for a copy of the Hospital policy, which the staff refused to give her, so she refused to disrobe. They neglected to explain that if she did not disrobe they would forcibly strip her.

69. After only about ten seconds of forcefully insisting that the Plaintiff disrobe, approximately four of the staff, including John Doe[3] male mental health workers, grabbed her, lifted and suspended her off the floor by the wrists and ankles (one of them holding each of her extremities), and another one opened the button of her jeans, unzipped them and stripped them off, while Plaintiff was pleading for them to stop. Other John and Jane Doe members of staff were observing the performance (this must have been some kind of employee training exercise). The Plaintiff was wearing low-rise jeans so the one who unzipped them had to fumble around and exert some force in her intimate area to unbutton and unzip them.

70. Plaintiff can't remember the names of all of the mental health workers who assaulted her, and two of them were behind her holding her by the arms so she couldn't see them, but she does remember that one of them who was holding a leg was a mental health worker ironically called "Lucky" (surname unknown), and Ms. Andersen remembers that he was leering at her "lady parts" while the forced strip was taking place.

71. The incident may have happened in full view of other patients and visitors, because the Plaintiff's room door was open, and the hallway outside it was open to the public, which was actively used by both patients and visitors. The fact that it happened in a public area was a violation of the Plaintiff's right to privacy and heightened her emotional distress. If Plaintiff's seven year old son had walked down the hallway to visit his mother at that moment, he would have gotten an impromptu and premature lesson in sexual violence. The identities of the John/Jane Does who witnessed the assault upon the plaintiff may be obtained through discovery, along with the full names of other staff whose surnames the Plaintiff does not remember.

---

[3] NYMHL § 33.06 "Reports of abuse or mistreatment," states "The inability of the person reporting the abuse to identify the alleged perpetrator shall, in no circumstance, constitute the sole cause to reject such allegation for investigation or fail to refer such allegation for corrective action."

72.     When the staff had torn off her pants, they then carried her half naked down the hallway from her room (still suspended by her wrists and ankles) to a tiny cell called the "quiet room" that had no furniture except a mat on the floor and no windows except a small slit in the door.  They locked her inside the cell, alone. They did not inform her how long they intended to imprison her there.  This was an unnecessary and excessive use of restraint and seclusion.

73.     Plaintiff shouted at the perpetrators, several of whom were lurking outside the cell, "How could you do that to a woman who has been raped?"  She says: "Judging by the expressions on their faces it was obvious they knew they had done something wrong."

74.     The culprits eventually allowed her out of the cell after an indeterminate period of time, insisted that she walk down the public hallway in her panties, to return to her room, then change from her clothes and put on a gown while they observed.  This was mortifying for her, because she considers herself rather square, is self-conscious about her body (particularly her scarred belly), and doesn't even wear a bikini on the beach. She continued to refuse to remove her T-shirt, but wrapped a gown around her lower half, tying it like a skirt.  The staff then confiscated not only the pair of jeans they had stripped from her body, but every pair of pants that the Plaintiff had in the Hospital.  These were not returned until June 16th, as noted in the clinical records.

75.     Plaintiff then "called 911 to go to another hospital for an MRI" as reported in no uncertain terms by nurse Catherine Ames in the clinical records. Ames' Nursing Progress Note in the records is irrefutable evidence of the assault.  The Plaintiff tried to call 911 because she was concerned her back had been injured in the stripping incident – with good reason because she had recently undergone major spine surgery.  However, a giant staff member called "Rodney" (surname unknown), who was more than twice Ms. Andersen's size, loomed over her and forcibly hung up the phone while she attempted to make the 911 call.  His hanging up the phone in a menacing way constituted invasion of privacy and further infliction of distress.  Rodney was very physically intimidating; he would have made most NFL players look diminutive since he bore a resemblance to New York Giants' defensive tackle Shaun Rogers.

76.     Plaintiff says: "The Hospital has alleged that there was no deviation from the standard of care.  But why would I have dialed 911 and asked for an MRI if I hadn't been physically assaulted?!  That was an unambiguous, urgent objection to possible injury. Which country's standard of care do they follow, Iran's?"  She reported back pain the next day and asked to be transferred to North Shore Hospital for evaluation, a request that HILLSIDE staff denied.

77.     "Standard of care" is defined as the caution that a reasonable person in similar circumstances would exercise in providing care to a patient.   The Plaintiff says, "yes, the term 'standard of care' is subjective, but every unbiased person with whom I have spoken about the HILLSIDE fiasco agrees that what the Defendants did to me was unconscionable.  Furthermore, NSLIJ is a large group of sixteen hospitals on Long Island

and in New York City, including several so-called major teaching hospitals, so they should be setting the standard of care for everyone else in the industry to follow, not mimicking the hospital industry's worst offenders."

78.     At no time during this entire episode did Plaintiff state, imply, or otherwise indicate that she had any current thoughts or intention to hurt herself or anyone else.  The clinical records (which are over 300 pages long) confirm this over and over again, every single day of the Plaintiff's detention at HILLSIDE. Plaintiff points out that she is only 5'2" tall, 115 lbs, age 50, disabled, not very physically fit, and has no history of violence, so she certainly did not pose any threat to the staff. At no time during this entire period did Ms. Andersen act in a manner that would have led a reasonable health care professional to believe that there was any immediate risk of harm to the Plaintiff or to others.  Ames' nursing report that day stated unequivocally that the Ms. Andersen had not been dangerous to herself or others on that day, so any suggestions to the contrary by the Defendants would not be credible.

79.     Plaintiff was not offered the option of a pat-down, wand or other less invasive search methods.

80.     It was unreasonable in this case to place into a hospital gown a psychiatric patient that had just made an escape attempt, for three reasons: (1) The Hospital admitted there was zero consent by the Plaintiff.  (2) Plaintiff had no history of violence, criminal convictions, gang membership, possession of contraband, or use of weapons, so there was no probable cause for a search.  (3) Plaintiff was subsequently confined to indoors and put on "C.O." (Constant Observation), and was thereby absolutely prevented from escaping, so the additional requirements of stripping, and donning hospital gowns, could not be anything but punitive.  (NB: Patients under the C.O. precaution must be within the sight of, and no more than three feet away from, a staff member at all times.)

81.     Although many mental health professionals were available at the Hospital, no one evaluated Plaintiff's current safety risk by asking her any questions about her current thoughts regarding self-injury or whether she was carrying anything that she might use to hurt herself or others, before ordering that she be forcibly stripped.  There was zero informed consent.

82.     The Defendants' conduct, including but not limited to gang assault and gang-stripping of a woman known to have a history of sexual and other trauma, was extreme and outrageous, and beyond all possible bounds of decency in a hospital setting.  They should have known that this would cause her extreme emotional distress.  To paraphrase the Supreme Court (on the subject of pretext searches), to condone this Hospital's behavior would make a mockery of our basic constitutional rights.

83.     During her 18-day incarceration at HILLSIDE, the Plaintiff did not hear or see any other patients being subjected to a "search" of any kind, so this treatment must have been discriminatory.

84.     Seclusion means "the involuntary confinement of a patient alone in a room or area from which the patient is physically prevented from leaving. Seclusion may only be used for the management of violent or self-destructive behavior." The term "restraint" refers not only to physical restrictions such as handcuffs, or even human hands, but also to chemical restraints such as psychotropic or narcotic drugs. The Centers for Medicare and Medicaid Services (CMS) has ruled: "The patient has the right to be free from restraint and seclusion, in any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff." 42 C.F.R. §482.13(f)(1) (1999). "Restraint and seclusion can only be used in emergency situations if needed to ensure physical safety and if less restrictive interventions have been determined to be ineffective." 42 C.F.R. §482.13(f)(2) (1999). A physician or licensed independent practitioner must conduct a face-to-face assessment within one hour of the intervention, under CMS regulations, but HILLSIDE staff did not perform any kind of assessment. New York Mental Hygiene Law reiterates CMS' prohibitions, adding that "Restraint and seclusion are not to be used as punishment, or for the convenience of staff or as a substitute for treatment, and excessive force shall not be used."

85.     Plaintiff also gave Jane Doe employees a handwritten notice of her objections to the illegal treatment she had received, but they neither responded to the notice nor included it in her medical records. She even posted a handwritten notice on the wall in the nurses' station, which the staff removed. In desperation, because her complaints went unheeded, the Plaintiff wrote her objections on the door of her room, which the staff erased… and then confiscated her pen. She borrowed the pen from the public notice board in the hallway and wrote *"Primum non nocere"* on the board, as a reminder to the staff. (This is a Latin phrase that means, "First, do no harm", and is one of the principal precepts of medical ethics.) The staff immediately erased this, despite the fact that other patients were allowed to write on the notice board.

86.     The Centers for Medicare and Medicaid Services has laid out requirements for the process of handling patients' grievances in 42 C.F.R. §482.13, which HILLSIDE completely ignored; this is another part of CMS' Conditions for Participation.

87.     In this incident, the Hospital and Defendant individuals violated their own published Code of Ethical Conduct and hence also New York General Business Statutes Article 22-A – false advertising and protection from deceptive practices, several tort laws, New York State Title 14 sections pertaining to patients' rights to refuse treatment, Title III of the Americans with Disabilities Act, and most of the New York State Patients' Bill of Rights. The Hospital and Defendant individuals also interfered with the Plaintiff's constitutional rights to due process, privacy, freedom from unreasonable searches and freedom of speech.

**Plaintiff's willingness to take lie detector test**

88.     The Plaintiff says: "I contend that the existing evidence against HILLSIDE is incontrovertible, but I offered to submit to a lie detector test to prove that what I'm saying about HILLSIDE is true. The Defendants formally declined. I challenged the

Defendants to take a polygraph test also, but they were unwilling to do so.  Of course what I am saying is true.  Truth is stranger than fiction."

89.     Ms. Andersen adds: "I will subpoena the surveillance camera records for the ward, but I doubt they have any security cameras; it would give mistreated patients too much ammunition against the Hospital."  If HILLSIDE does not have CCTV in the ward, the Hospital is guilty of negligent security, as psychiatric facilities have a responsibility to protect patients in their care.  Ms. Andersen's research indicates that there are security cameras at the Cohen Children's Medical Center, which provides psychiatric care for minors; HILLSIDE should not have different policies since it also provides care for minors; in fact it has an entire ward for teenage children.

## Plaintiff's thwarted attempts to clarify hospital policy

90.     Plaintiff made several vain attempts to gain clarification of the Hospital policies before and after hospitalization.  Immediately after the incident, Ms. Andersen asked head nurse Catherine Ames several times for a copy of the Hospital policy.  The latter finally showed the Plaintiff an excerpt from the Hospital policy on automatic disrobement, but she was only able to read a few sentences before Ames snatched it out of her hands.  Ames refused to explain why she took the document away.  Plaintiff says: "If they won't tell you what the rules are, how can you be expected to adhere to them?!  There were no rules posted anywhere in the unit.  The National Quality Forum (NQF) gave NSLIJ its National Quality Healthcare Award in 2010 for, among other things, 'transparency'.  Really?  Transparency?  A hospital that won't release its policies or a patient's medical records?  Either things went dramatically downhill since 2010, or NSLIJ has pulled the wool over NQF's eyes."  The National Quality Forum has published a list of Serious Reportable Events (SREs) leading to patient injury, also called "Never Events".  HILLSIDE committed two Never Events: inappropriate use of restraints, and physical assault, however they failed to report these events to any regulatory authority.

91.     Ames quoted the Plaintiff in the medical records as saying, "You are violating all of my rights."  Ms. Andersen says: "If that isn't an urgent request for legal advice I don't know what is.  I asked over and over to see a lawyer and they deliberately neglected to document that."  This was in violation of New York State MHL Title 14 right to legal counsel, sec. 27.8 d.

92.     After discharge Plaintiff spoke to Ms. Una Warde ("Warde"), of the Quality Management department at HILLSIDE, who refused to give her a copy of the relevant section of the Hospital policy (pertaining to automatic disrobement) when Ms. Andersen asked again for it, but Warde did allege verbally that it said the following: when the patient is returned to the Hospital "after [attempting escape], a patient/property search is completed", and "a decision has to be made [by the care team] about attiring the patient in pajamas or Hospital gowns".   The phrase "attiring the patient" is further evidence that this procedure implies lack of consent by the patient.  Ms. Andersen never received a

copy of HILLSIDE's policies, which she requested several times from different staff members, so this is a matter for discovery.

93.    Plaintiff also asked the head nurse to allow her to see her medical records after the incident since this was on the Patients' Bill of Rights, but nurse Ames told her that she could not see them until after discharge. Ms. Andersen states, "This enables the Hospital to say anything it wants in the medical records and the patient has no opportunity to correct or add to them. You can ask for something to be documented in the records (which I did) but you don't find out until several months later that Hospital staff deliberately failed to document it. This is another of the many examples of how patients are made to feel utterly disempowered at HILLSIDE." Under the New York State Patients' Bill of Rights and CMS Patient's rights: 42 C.F.R. §482.13, patients have the right to see their medical records; it does not say they can only see them after discharge.

94.    HIPAA regulations also require that a patient be able to inspect her medical records within ten days of asking for them.  New York State Education Law section 6530, #22, defines medical misconduct in part based on violations of patients' rights to inspect their medical records.  The Defendants contravened HIPAA rules by failing to provide the Plaintiff's medical records on a timely basis, which is by law within ten days of their being requested.  They did ultimately provide her medical records, but not until three months after discharge from the hospital, and what she received was incomplete. The fact that she did not receive them before the HIPAA deadline prevented her from being able to correct the multitude of errors in the records while she was still in the Hospital, and thereby ensure her prompt discharge from HILLSIDE.

95.    The medical records gloss over the automatic disrobement incident, but do state in several locations "Patient attempted to elope [i.e. escape] by climbing the fence in the patio. Patient placed in gowns as per policy."  Ms. Andersen points out "Any unbiased, reasonable person would consider this language ('patient placed in gowns') to imply lack of consent.  You can 'place' an object or an animal into something, or an unconscious patient, but not a conscious nonviolent but unwilling adult."

96.    The Plaintiff stated in her handwritten notes that the next morning her back hurt from the brutal attack she had been subjected to the previous day, her iPad, Macbook (laptop), iPhone, and reading material were missing, she had no clean clothes since the staff had confiscated them, no money to use the payphone, and no contact lenses.  There was a "free" phone in the hallway that could be used by patients to make only local calls, around which there was usually a crowd of several patients eavesdropping while waiting to use the phone.  At any rate, Ms. Andersen's contacts were all saved in her iPhone, which had been confiscated, so even if she had obtained access to the "free" phone, she didn't have many numbers to call.

## Psychiatrists' irresponsible response to stripping incident

97.    Plaintiff mentioned the disrobement incident at her next meeting with Karlin, and the latter responded threateningly in her heavy Russian accent "you hef to starrt tekking

23

rresponsibeeliteh for yourr own ektions" (sic).  Karlin also – astonishingly – stated that it was Hospital policy to remove a patient's clothes as a form of punishment.  This was willful intimidation of the patient and a breach of Section 6530, #31, of the New York State Education Law.  Under the NYS Patients' Bill of Rights and CMS Patient's rights: 42 C.F.R. §482.13, the patient has the right to complain without fear of reprisals, but Karlin intimated that the Plaintiff might be punished again if she complained.  After this Ms. Andersen became convinced Karlin's intentions were dishonorable and stopped telling Karlin what she was really thinking.

98.     Karlin also confirmed that she hadn't read Ms. Andersen's book yet, despite the Plaintiff having insisted that Karlin read it before any further treatment.  This was irresponsible and negligent psychiatric patient care.  Shortly after the stripping incident, Karlin admitted she had read the book and her attitude toward the Plaintiff became more conciliatory, although she neglected to mention anything in the medical records about this.

99.     However, Plaintiff described Mendelowitz, who was the chief of the unit, as remaining arrogant, patronizing and unsympathetic, despite the fact that she had pointed out to him that the "New York State Patients' Bill of Rights" was posted on the wall and that HILLSIDE had violated at least twelve of the Plaintiff's rights.  He refused to read her book or at least admit that he had done so, despite her having repeatedly requested that he do so, which was medical negligence.

### Forcible stripping was corporal punishment, not a search

100.    Even more damningly, the Defendants did not perform any search-related actions other than forcibly stripping off the Plaintiff's clothes; they did not check the Plaintiff's hands, feet, hair, ears, armpits, bodily orifices, or clothing other than her jeans, which they violently removed from her body despite the Plaintiff's protestations.  The normal usage of the term "strip search" involves a detainee removing his or her own clothing to be searched, not for that terrified person to have the clothing forcibly torn from his or her body by someone else.  This indicates that the Defendants' primary reason for forcibly stripping the Plaintiff was pretextual; it was not for 'search' purposes, but as thinly-veiled corporal punishment – which Karlin later admitted.  Plaintiff had no history of crime, violence, possession of contraband, gang membership or use of weapons so there was no probable cause.  She had been searched at admission, and had already been an inpatient for two days without demonstrating any violence or harboring any kind of contraband.  The daily nursing progress notes for all 18 days specifically documented that she showed no signs of violent or suicidal thoughts or tendencies.

101.    Additionally, carrying a human body suspended by the wrists and ankles like a sack of potatoes, such that the lowest point of the body is the base of the spine, is not a recommended technique in the health care profession. This is especially true if the person being carried has a previous spine injury and is struggling to get free.  Preliminary engineering calculations show that this carry method could have exerted several hundred pounds of force on the Plaintiff's spine, even without accounting for her struggling,

which would have increased that force considerably.

102.    It will be necessary and interesting to study HILLSIDE's policies and procedures when they can be obtained through discovery.  It would be nonsensical if the Hospital had a policy or practice of strip-searching voluntary patients after an escape attempt, since voluntary patients are allowed to leave the hospital at any time.  Because voluntary patients are commingled with involuntary patients on HILLSIDE's wards, this would create another discriminatory situation (voluntary patients being better treated than involuntary) and would surely expose some of the Hospital's constitutional violations if it prevented a voluntary patient from leaving.  Plaintiff did not hear of any other patients being forcibly stripped while she was an inpatient, so this is also indicative of a discriminatory animus (and examining some of the Hospital's clinical records should help determine how many and which type of other patients are typically stripped).  So whether or not the Hospital has a policy that purportedly requires "ALL" patients to be stripped, the Defendants' contention that "ALL" patients are stripped in practice after escape attempts is likely to be proved false.  It is absurd to suggest that anyone checking into the Hospital of his own accord would be violently prevented from checking out.

103.    It will be interesting to compare statistics on stripping incidents at the Hospital in voluntary patients (if any exists) versus involuntary patients, when such information is obtained through discovery.  One would then inquire as to whether this "treatment" is reserved specially for Medicaid/Medicare patients, who are more likely than others to be hospitalized involuntarily.

### Physical assault and forcible injection incident

104.    Plaintiff endured another incident (on June 18th, 2011) of forced treatment accompanying physical assault at HILLSIDE.

105.    The Plaintiff had become upset because Karlin had told her that the staff would allow her to have her portable stereo so that Ms. Andersen could listen to music privately in her room, but the staff had been retaining it in the nurses' station for several days with no explanation.  They argued that it had an antenna, which a patient could use to stab someone.  The Plaintiff pointed out to the staff that it would take no more than a minute to remove the antenna with a screwdriver or even a nail file, but they would neither allow her to do this, nor agree to do it themselves.  As Ms. Andersen points out "How is an antenna, the same size as a pen, any more dangerous than the pen?  It's ridiculous."  However, staff allowed the particularly annoying patient Lorenzo Nevers (who exhibited disturbing symptoms of schizophrenia) to monopolize the audio system in the common room with his excessively loud rap music.  This inequity (and noise) grated on the Plaintiff, and she believed it to have been malicious on the part of the HILLSIDE staff.

106.    When she went to the nurses' station to complain, Plaintiff found that the head nurse on duty (called by the staff "Susie", whose name appears in the medical records as Soosamma Kompancaril) was not wearing a uniform or any ID, and was incapable of or unwilling to communicate with the Plaintiff in English.  Failure to wear ID on a hospital

ward is unprofessional, and a breach of Section 6530 of the New York State Education Law, clause 39. The irony of this, of course, was that the Plaintiff had been locked up for allegedly not having enough ID to leave the country (despite having various legitimate forms of official ID), and yet this individual, who was clearly a relatively recent arrival in the US from the subcontinent, was running a locked mental ward but could not produce any ID at all.

107.    Plaintiff demanded to speak with the doctor on call, but Kompancaril refused to let her do so and wouldn't even give her the doctor's name. The Plaintiff became anxious because she was alarmed that the person who was supervising her care in a locked ward appeared not to be a legitimate member of staff, and could or would not justify her actions in English.  Ms. Andersen did, however, return to her room on request, where she paced the room and calmed her own anxiety.

108.    After the stripping incident Plaintiff had good reason to be concerned about the professionalism of HILLSIDE staff.  Under the NYS Bill of Rights, a patient has the right to know who is in charge of his or her care, receive considerate and respectful care, and to refuse treatment, and all of the Plaintiff's rights had been violated, among others. These rights are reiterated in CMS Conditions for Participation: Patient's rights, 42 C.F.R. §482.13.  At this point approximately seven nurses and/or mental health workers cornered Plaintiff in her room, causing her to become terrified as a male stranger approached her holding a syringe pointing at her like a weapon in his hand, and administered an injection in her arm against her will.  She recalls vividly how they advanced in a group toward her as she backed into a corner.

109.    Plaintiff describes the individual who administered the injection as a Filipino nurse called Abraham Lopez, who was inappropriately attired in street clothes, including a black shirt.  She found this strange, since, having been in the microbiology business for many years, she knew that hospital ward uniforms are never black, for hygienic reasons.

110.    The medical records confirm "intramuscular injection given with support team" (Kompancaril's Nursing Progress Note), which is further irrefutable evidence of battery. Plaintiff says: "Obviously you don't need a 'support team' of seven people to inject a patient unless he or she is unwilling... especially a tiny middle-aged woman with a back problem!  There was no need for them to forcibly inject me when I was already quiet and in my room; it was clearly retaliatory, since I had just finished criticizing the head nurse, for legitimate reasons.  I was not psychotic, and had no need for the Haldol.  It is worth mentioning that ALL of the members of the Mr. Lopez's aggressive so-called 'support team' were African-American, although I will need to get to discovery to be able to draw any conclusions about the significance of that fact.  I only thought it was odd at the time, and unlikely to be coincidental, since the ward staff were of various races."  When she was cornered, Plaintiff eventually acquiesced to the injection because she was afraid that she would be seriously physically injured if she objected any longer. She describes this experience as "a nightmare scenario, something out of *One Flew Over the Cuckoo's Nest* or *Shutter Island*".  CMS Patient's rights: 42 C.F.R. §482.13 states "Orders for the use of restraint or seclusion must never be written as a standing order or on an as needed basis

(PRN)".  Haldol[4] had been prescribed for Ms. Andersen on a PRN basis, and Lopez used it as an involuntary method of restraint, which is prohibited by law.

111.    The Plaintiff says: "Mendelowitz has published a study in the psychiatry journals about 'the utility of intramuscular antipsychotic injections in agitated patients', so perhaps he was including me as a guinea pig in his research.  I don't recall having given permission for that."

112.    As in the stripping incident, at no time during this entire episode did Plaintiff state, imply, or otherwise indicate that she had any current thoughts or intention to hurt herself or anyone else.  The medical records confirm this.  The use of Haldol was unauthorized by the patient, unnecessary and excessive.  As in the stripping episode, there was zero informed consent.  This was another example of poor hiring, supervision and training practices at HILLSIDE.

113.    As in the stripping incident, the Defendants' conduct – cornering and forcibly injecting a nonviolent woman known to not only have been raped, but also to have recently undergone spine surgery, not to mention physical violence by her spouse – was extreme and beyond all bounds of decency in a hospital setting.  The staff had been notified about her history and should have known that this would cause her extreme emotional distress.  It is particularly egregious considering the stripping incident that had occurred only three days previously, about which the Plaintiff had already complained.

114.    Plaintiff says: "I didn't hear of any other patient on the unit being forcibly injected in the entire time I was there, so this treatment may have been discriminatory, or perhaps simply retaliatory."

115.    In this incident the Hospital and Defendant individuals violated another long list of rules – including several tort laws, New York State Title 14 sections pertaining to patients' rights to refuse treatment, and most of the New York State Patients' Bill of Rights, i.e. Public Health Law section 2803(1)(g), and 10 N.Y.C.R.R. sections 405.7, 405.7(a)(1) and 405.7(c).  The Hospital and Defendant individuals also interfered with the Plaintiff's constitutional rights to due process and freedom of speech, and rights under the Americans With Disabilities Act.  Not to mention NSLIJ's own published Code of Ethical Conduct and hence also New York General Business Statutes Article 22-A – false advertising and protection from deceptive practices.

## Denial of mother-child contact

116.    The Defendants would not allow Plaintiff's son (who was seven at the time) to visit her in the Hospital until June 23rd, after she had already been there for ten days.  This was a painful separation, which caused further emotional distress both for her and for her son.  He is still upset by memories of the experience.  To inflict this kind of

---

[4] Haldol is a brand of antipsychotic called haloperidol, which is produced by Johnson and Johnson's Janssen Pharmaceuticals division.  It is used to treat acute psychotic states and delirium, neither of which Plaintiff exhibited.

emotional distress, without a hearing, on a child whose parents had separated only a few days previously, and on a patient with a history of PTSD and recent emotional trauma, was cruel, inhumane and excessive.  She says, "Having contact with one's child, for a patient who is non-dangerous, is a basic human right, not a privilege.  It is despicable to use a child to manipulate a patient."

117.    The Defendants' argument for not allowing Plaintiff's son to visit was that the environment in the ward might be too dangerous or frightening for him.  For that reason, when they belatedly allowed the Plaintiff to see him, they would only allow her to meet with him for an hour in a tiny, windowless, airless conference room, the only redeeming characteristic of which was that it had good acoustics.  Inexplicably, they would not even allow him to visit her in her room.  Ms. Andersen says, "It struck me in retrospect that if they considered the environment in the ward too dangerous for my son, isn't that an admission on their part that it was too dangerous for me?  Either the ward was too dangerous for both of us so they were guilty of negligent security, or it wasn't dangerous so they should have allowed him to see me sooner and in my room, and they are guilty of inflicting emotional distress.  Either way the Defendants are liable."

### Farcical and humiliating "behavioral contract"

118.    The medical records written by the so-called "psychology fellow" at HILLSIDE called Shveta Mittal, exemplify more of the degrading, humiliating and unethical treatment that was inflicted on Plaintiff.  Mittal coerced her into signing a patronizing behavior contract and then failed to adhere to it.  For example, Mittal told the Plaintiff that if she behaved the way Mittal wanted her to, the Plaintiff could "regain access to [her] shoelaces".  Plaintiff says, "This was because I had been forced to walk around without shoelaces for over a week, with my sneakers sliding around on my feet like slippers, which was humiliating, uncomfortable and prevented me from getting adequate exercise.  Mittal's justification for that insulting requirement was that having no shoelaces would make it more difficult for me to try to escape again.  Even my little boy would have found such treatment farcical if an adult imposed it on him.  Having appropriate and safe clothes is a right for a patient, not a privilege.  Their justification for taking my shoelaces was particularly ridiculous because they had me on CO (constant observation), meaning that a member of staff was following me 24/7 as a bodyguard, and they wouldn't let me go outdoors, so how could I have tried to escape again?"  Clearly, Mittal was as badly trained and supervised as the others.

119.    As if this weren't bad enough, the ludicrous forms of punishment continued.  The Plaintiff's son decorated some loose-fitting zip-up canvas sneakers, which had no laces, and the Plaintiff's family brought them to the Hospital for her to wear in lieu of the other sneakers with laces removed.  The new sneakers had sentimental value for Ms. Andersen, because her son had decorated them with hearts, smileys and messages like "love you" and "miss you".  Without explanation, the staff on the ward would not allow Ms. Andersen to wear or even have the sneakers.  Instead, the staff locked them up in a closet in the hallway for several days, before belatedly allowing the Plaintiff to have them.  Ms.

Andersen says, "What could possibly be wrong with a patient having a pair of decorated sneakers that are obviously not designed for climbing or running?!  This was more of the Defendants' petty, vicious behavior, which you wouldn't expect to see from anyone but a schoolyard bully under the age of ten."

120.    Mittal also stated, "for every four hours patient can adhere to this contract, [Ms. Andersen] will gain fifteen minutes of individual fresh air time" (i.e. time outdoors). This was because from June 14th to that date (June 20th), the Plaintiff wasn't allowed to go outdoors to get fresh air at all, while all the other patients did.  This contradicts recommendations for the treatment of depressed patients, who benefit from daily exposure to sunlight.  The United Nations rules state that even prisoners of war are required to have at least an hour of fresh air time every day, and be allowed to wear clothing that is not degrading or humiliating.  Fresh air time is required by state law, even for dogs in animal hospitals.  The Plaintiff added a clause to Mittal's ludicrous behavioral contract stating "I sign this with the proviso that all the staff involved in my care do their utmost to ensure that I can be discharged from HILLSIDE as soon as possible".  Ms. Andersen signed this on June 20th and adhered to it, but was not discharged until ten days later on the 30th. The staff did not make any effort whatsoever to facilitate her discharge until, in desperation, she complained to her U.S. congressman and the press.

## Hospital's deplorable conditions

121.    Plaintiff describes HILLSIDE as "old, dirty and poorly equipped, with badly trained and ill-supervised staff.  It frankly made most jails look lavish, because at least prisons have amenities like computer access, libraries, and gym facilities.  HILLSIDE has nothing but a small sad-looking paved outdoor area with a single basketball net and one old ping pong table, which were usually monopolized by the other – sometimes aggressive – patients."  Furthermore, the Plaintiff was forbidden from going outdoors for several days, so she could not have used the ping pong table or basketball net even if she had wanted to.  The ward had two small TVs shared among 30 patients, and one laptop computer in a tiny windowless room to which access is granted only 15 minutes a day – if at all.  In fact, Ms. Andersen wasn't allowed to use the computer at all until June 28th, sixteen days after admission.  She says, "I have been an inpatient in several hospitals, and seen dozens of them in my career in the medical technology business.  This was by far the worst I've ever seen in the western world.  It was worse than Spartan; it was boot camp."  She noted that the only equipment that was used in her care were basic vital signs monitoring machines worth less than $1,000 each.

122.    She repeatedly asked John/Jane Doe employees for the window screens in her room to be cleaned, because they were so filthy they blocked out the daylight.  These requests went unheeded so she attempted to do it herself with a toothbrush.

123.    Plaintiff discovered that HILLSIDE had neglected to properly train key members of staff on the ward.  She asked one of the mental health workers ("Simon Herbert") whether the Hospital offers them any continuing education (CE) and he said no, that the staff had to organize their own CE outside of working hours.

124.     These experiences and others contributed to Plaintff's anguish and frustration due to being kept at HILLSIDE against her will, and impression that HILLSIDE's motives for keeping her there were commercial and probably political as well.  Ms. Andersen took handwritten notes during her stay at HILLSIDE with names, witnesses and further details of additional distressing incidents.

125.     The Plaintiff says: "I didn't go in to HILLSIDE as an investigative reporter or a potential litigant, but they turned me into one through their egregious behavior.  I feel sorry for the less fortunate, vulnerable patients who go there for help and are mistreated but aren't mentally well enough to document their experiences in the way I did."

## Financial analysis shows scale of HILLSIDE's federal funding

126.     HILLSIDE's financial motivations for keeping Plaintiff there as an inpatient were revealed after her discharge.  The Plaintiff received documentation from her insurance company that HILLSIDE was paid $66,753.04 (or $3,708.50 a day) by the Hospital, as she says: "for imprisoning me there involuntarily as an inpatient, which is astronomical especially considering the abysmal care it provides and its low overheads due to pathetic patient facilities.  And $3,708.50 per day doesn't even guarantee you a private room; they try to force crazy, aggressive roommates on you.  It's usury.  The Hospital also charged United Healthcare $2,973 for alleged laboratory tests, the results of which did not appear in the medical records, so one can assume that they were not performed."

127.     The Plaintiff points out, "With a capacity of about thirty patients, at that daily rate the unit could generate over $1.35 million per patient or $40 million total revenue a year. And the entire Hospital has 236 beds, which could generate over $300 million annually."

128.     Plaintiff says: "One of my fellow patients, 'Tony Palladino', told me he was also being kept there against his will, and had requested a hearing to be discharged.  He seemed perfectly *compos mentis*, and told me that among other things, HILLSIDE had billed his Medicare $1,700 for electrocardiograms that he complained were unnecessary."

129.     The Plaintiff adds: "So let's estimate HILLSIDE's costs.  Let's say that just one ward had twenty staff on duty full time at $150,000 annual average each (total $3 million, which is a high estimate since the average psychiatric nurse gets paid $66,000 a year and the average mental health worker $53,000 per year).  The building might have cost them $500,000 a year to maintain (again a high estimate since the '3 Low' ward is only about 10,000 sq. ft., part of a building with several other wards).  You might budget $100 a day per patient for medications and equipment, and $50 per patient a day for administration. Added together that is only $5 million running costs so you can see how obscenely profitable this business is."

130.     Plaintiff continues: "The ward was near maximum capacity during the time I was

there, but even at 25% capacity it would still be a cash cow.  Unsurprisingly, HILLSIDE is managed by an accountant, not a physician – i.e. Joseph M. Schulman, the Hospital's Executive Director.  That is illustrative of where the Hospital's priorities lie – in its bank accounts, not in the health of patients.  NSLIJ is officially a nonprofit entity but there are still ways of milking the money out of the business, for example through inflated salaries for executives like Joseph Schulman's boss Michael Dowling who is paid well over $2 million a year.  The Hospital can also further its executives' ambitious plans to expand their empire, and support their favorite charities."

131.   The Plaintiff adds: "Many of the patients at HILLSIDE are on Medicaid or Medicare so there is adequate evidence to assert that HILLSIDE is defrauding the public system.  I called the Hospital anonymously, posing as a patient with no insurance whose family would pay for my Hospital fees, and the John Doe staff member with whom I spoke immediately suggested that he apply for emergency Medicaid status on my behalf instead.  He acknowledged that many of HILLSIDE's patients are on Medicaid.  It's obvious when you talk to the patients that many of them are there because they need somewhere to sleep and get a hot meal, not because they are ill enough to be hospitalized."

132.   The Hospital contravenes the rules set out in the Centers for Medicare and Medicaid Services (CMS) Conditions of participation (42 C.F.R. §482.13), to which it presumably made assurances to the government that it complies.  For a hospital to make false statements to CMS about adherence to its regulations is technically a fraud committed against the government and not against an individual patient, but I mention it because it provides evidence of the Hospital's deceptive business practices and generally abusive treatment of patients, and provides irrefutable proof of federal funding.  It's likely that HILLSIDE would be forgiven for one or a few invoices, but this is a pattern of deliberate behavior that seems to be occurring on a regular basis.  The Defendants had to have made false assurances about compliance to CMS in order to obtain reimbursement for Medicaid and Medicare claims.

133.   The Plaintiff reports that the so-called "outpatient social worker" who was assigned to her by Rachel Jacobson (the inpatient social worker) when she was discharged, Marta Filleborn, billed her insurance company $1,000 for an involuntary "home visit" after her discharge.  This consisted of Ms. Filleborn meeting her in the parking lot of her doctor's office for no more than five minutes and asking her a few questions while Ms. Andersen was getting out of her car for an appointment with her internist.  Under NYS Education Law Section 6530, clause 26, patients have the right to refuse unwanted professional services.

134.   The following damning excerpt is from *"The Privatization of the Civil Commitment Process and the State Action Doctrine: Have the Mentally Ill Been Systematically Stripped of Their Fourteenth Amendment Rights?[5]"*

> *The increase in private, for-profit hospitalization has resulted in the proliferation*

---

[5] William Brooks, Touro Law Center, (40 Duq. L. Rev. 1 2001-2002).

*of pernicious actions designed to increase the profitability of hospitals.  Psychiatric hospitals have lured individuals into psychiatric treatment by instituting massive advertising campaigns designed to promote the benefits of treatment.  However, once hospitalized, patients found it not so easy to leave, at times facing intimidation from hospital staff when they decided they no longer wanted to receive inpatient care and treatment.*

*Moreover, the attempts to increase revenue by private psychiatric hospitals have not stopped with attempts to procure voluntary admissions.  Private hospitals seek to maintain certain census levels on the wards.  Some hospitals have used "bounty hunters" to transport possible candidates for involuntary hospitalization.  Hospitals have based the length of the patient's confinement not on the individual's clinical condition but on the length of insurance coverage, discharging individuals once insurance has expired.  Not surprisingly, the emphasis on profits has resulted in private hospitals admitting individuals who did not need inpatient hospitalization.*

### Plaintiff's conclusion and current state of health

135.    Plaintiff states: "This case is not about whether I had the right to buy an airline ticket, or even whether I was sane on June 12th, 2011.  It is about our fundamental rights as Americans, which are given to us by the Constitution.  It is also about respect of disabled people's rights; particularly those with mental disorders, of whom there are 75 million in America.  And, last but not least, this case pertains to a woman's right not to be subjected to sexualized violence – especially not in a mental healthcare context.  I am pursuing this litigation not just for myself, but also for them… and for the millions of Americans who don't yet understand the potential implications of indefinite detention, without a hearing, of American citizens on US soil… a controversial topic currently being discussed on Capitol Hill."

136.    "This case is a litany of nearly everything that is wrong with the current mental healthcare system in America. It is a good example of what happens when a healthcare provider becomes so huge and politically powerful that it considers itself above the law.  Like the British NHS (National Health Service) and other excessively bloated providers, NSLIJ has – to use a British expression – become too big for its breaches (sic).  I hope this case will help potential plaintiffs for generations, to seek justice if they are mistreated in a psychiatric hospital.  HILLSIDE needs to be punished severely so that neither they nor anyone else in the psychiatric business will ever forget this.  Maybe this will help prevent the abuse from happening in the first place."

137.    "The case also exemplifies what is wrong with our voting rights laws.  It is preposterous that I was incarcerated in a mental hospital without a hearing for 18 days, for allegedly not having enough identification to leave the country (despite having various legal forms of ID).   And yet in one episode the head nurse in charge, who could barely speak English, was allowed to run a locked mental ward without a uniform, and could not produce any ID at all.  Because I was imprisoned, I would not have been able to

vote if there had been an election, but she would have.  How does that make any sense?"

138.    "And regarding security cameras: I recently got a traffic fine from Nassau County for turning right at a red light without stopping completely, only one second after the light changed, based on a traffic camera image.  No other cars were around, and I didn't hit anything.  And yet, the Defendants don't think they need to show the court their security camera records, which (if they exist) will show me being stripped and stabbed.  The County, the City and the State, and their various officials, don't seem to have a problem with that.  Let's see if a jury and the public has a problem with it."

139.    The Defendants and associated parties have targeted Plaintiff with a variety of threats and retaliatory actions since she was discharged in June 2011.  She has witnessed three significant vindictive acts from LIJ since Andersen v. HILLSIDE was filed.  Since March 1st, 2012, various LIJ-affiliated doctors in positions of power have (1) advised Ms. Andersen to drop her case, (2) deliberately failed to respond to phone calls and renew critical prescriptions, intimating that if she did not drop her case, further prescriptions might be withheld, and (3) charged her fourteen times the market rate for a surgical procedure, and threatened to sue her to collect the vast sum in excess of the amount already paid (which also exceeded the market rate).  Plaintiff also had an inordinate amount of difficulty obtaining insurance company approval through UnitedHealthcare for some important medical treatment.  The threats have become more overt in recent weeks, since the Relator filed documents with the court that are even more damning of the Defendants' behavior.  When Plaintiff included the Nassau County DA in this case, the County suddenly increased the net tax payable on her parents' home, in which she lives, by 45%, and the Nassau County police informed her family that in future they will refuse to respond to alarm transmissions from their local business property, and imposed improper fines.  Plaintiff's mother, a physician, has been targeted with hostility from the New York State department of Health, which may also have been retaliatory.

140.    The Plaintiff says: "My experience at HILLSIDE deeply traumatized me.  I offered to go there in good faith, but was duped, locked up, and violently assaulted twice by health care so-called professionals whom I was supposed to be able to trust.  They assaulted me despite having acknowledged in their records that I was at no point during my stay at HILLSIDE a danger to others, or myself, and they had acknowledged in writing that I had already endured an excess of pain and anguish in my life.  I am a Christian with fundamentally pacifist views, and these philistines violated my religious beliefs with their gratuitous violence.  Stripping me and forcibly injecting me were unconscionable, totally unnecessary and undermined any trust I might have had in the staff.  It's something out of the dark ages of psychiatry, Huxley's '*Brave New World*', or Orwell's '*1984*', not 21st century America."

141.    "In my opinion, a psychiatrist has an even greater ethical responsibility to his patients than a priest to his parishioners.  Psychiatric patients tend to be vulnerable people, who tell their doctor not only their sins, as they would to a priest, but also the most intimate details of their lives and their entire medical histories.  Furthermore, the shrink prescribes medications for his patients that are dangerous if used incorrectly.  So

the psychiatric establishment deserves even more criticism when it allows a psychiatrist to abuse patients under his care, because of his greater professional and moral obligation."

142.   "I'm not a lawyer and am totally self-taught in law, but it doesn't take a legal genius to figure out that the number of laws and regulations that the Defendants defied in my case is just mind-boggling.  It's one of those cases where the Defendants' behavior was so unconscionable that you wonder whether they actually wanted to be sued.  It's as if they feel they can abuse patients with abandon, secure in the knowledge that they're unlikely to be sued because, as I discovered, there are very few lawyers willing to take psychiatric cases, public advocacy centers are underresourced (and cherry-pick cases that appeal to them politically), and *pro se* plaintiffs tend to lack the resources and experience to litigate."

143.   The Plaintiff points out: "My medical history was acknowledged to be complex, and yet I was left in the care of nurses and junior doctors who were not competent to make the decisions they were making about my care, hence they made disastrously bad decisions."

144.   Plaintiff says: "If I had needed to go to a hospital I'd have been much better off at the Priory in London where I've stayed before; it isn't ideal but it's a palace compared with HILLSIDE.  Frankly, I could have gotten more understanding and competent care at a Mossad Detention Center."

145.   The Plaintiff adds: "One of the first questions that an attending psychiatrist should interview a female patient about is whether she has ever been physically or sexually assaulted, especially given the Hospital's practice of forcibly stripping off patients' clothing and forcible injection of antipsychotics.  It is vitally important for a rape victim to feel that she is in control of any situation in which a stranger touches her body.  Stripping only belongs in a bedroom between two consenting adults, not in an institutional context, especially one in which a non-dangerous 'strippee' does not consent.  How is it OK to drug, strip and stab a woman on one side of a hospital's door, while inches away on the other side of the door it is illegal?  How is that any different from a rapist drugging her with Rohypnol and sexually assaulting her?  If sexual assault in the military is unacceptable, how is it OK when that happens in a hospital, and its employees are the perpetrators?"

146.   "I told Dr. Brar about my book, which discusses the rape, and she documented that in the clinical records.  Karlin, Mendelowitz and Hanna never interviewed me in detail about it, which is malpractice, especially considering what Brar had put in the admission report. Not only that, but they approved of their staff's decision to physically molest me.  How could three doctors, especially two female doctors, jointly approve of that?!  It's not simply institutionalized sexual assault… it is moral turpitude, from the bottom to the top of the organization."

147.   Plaintiff says emphatically: "I am a petite, gentle suburban mother of two, and

they treated me as if I were mass murderer on a rampage in a prison for the criminally insane. Hospitals and law enforcement must not treat a vulnerable person in the same way as they would treat a terrorist. People ask me how I could have been so stupid to believe the police when they told me I would be able to speak with the press at the hospital. I did it because I was raised to trust the police. In my dozen or so interactions with the police over the course of my life, they had never given me any reason to distrust them. I had previously had some incompetent psychiatrists, but never any that were genuinely evil, like the ones at HILLSIDE are. Call me a sucker, but I was shocked and horrified when the police and the psychiatrists deliberately deceived and abused me."

148.   The Plaintiff adds: "The Defendants' actions are made even more despicable by the fact that I had recently endured a difficult divorce, am struggling to raise a little boy on my own without a partner, and had already suffered through a rape, a troubled personal life, a difficult career, and disabling medical problems. I was trying to recover from a broken heart, broken piggybank, broken health and broken dreams, and HILLSIDE's 'prescription' for that condition was overt, deliberate cruelty."

149.   She says, "Even more damningly, my parents are both Long Island physicians, and my mother was formerly affiliated with NSLIJ. In fact, I come from a family of several doctors. So for HILLSIDE to abuse the daughter of a colleague was akin to molesting a member of their own family. The HILLSIDE shrinks took advantage of my family's misplaced trust in their professional judgment."

150.   Plaintiff asks: "Don't your human rights apply when you are in a psychiatric hospital in America in the 21st century? Are you any less human when you are an inpatient than when you are an outpatient? Do you check your constitutional rights at the door when you go in? Why do the police respond to complaints about patient-on-staff violence inside a hospital, but when it involves staff-on-patient violence, they don't? Is a crime committed inside somehow less illegal than one committed outside? How is it OK for hospital staff to confiscate all of a patient's possessions including clothing and contact lenses and not return them for several days? How is it OK to require other public places to make accommodations for disabled people, but not subject hospitals to the same requirements? Do disabled patients have fewer rights than other people? And, perhaps most importantly, why is there no accountability or transparency in our mental healthcare system???"

151.   Plaintiff now experiences nightmares about and flashbacks to these incidents and others at HILLSIDE, which are very upsetting for her. Since HILLSIDE, she feels reclusive and hindered by anxiety. She fears that if she puts one foot in the wrong place she could be locked up in HILLSIDE again, or another hospital just as dire.

152.   Plaintiff further states: "The horrors of my catastrophic experience at HILLSIDE are engraved permanently on my memory, and there is good evidence that I was healthier before I was admitted. Except for the week or two before I was admitted, when I left my husband and went to live with my parents, I was coping reasonably well in the few months leading up to the hospitalization… despite the negative effects of sleep

deprivation from stress.  HILLSIDE prevented me from resolving my emotional issues in my own way, which was to travel to the UK to see my son and my friends, as I was trying to do."

153.    The Plaintiff says: "Every time I discuss what happened at HILLSIDE I become upset and tearful; in fact I am in tears about this nearly every day.  Flashbacks to my horrible experiences there evoke flashbacks to the rape and other traumatic experiences from my past.  I feel demoralized, and am struggling to stay out of the abyss of despair.  I am distracted from work and other aspects of daily life by the constant rumination and flashbacks to HILLSIDE, which haunts me all the time when I am alone. Psychologically, I have also developed agoraphobia, obsessive-compulsive disorder, and phobias about the police, hospitals and being locked in, not to mention an inability to trust other people.  I've developed anxiety about traveling, which I never experienced before the HILLSIDE disaster. I have to take stronger medications now than I did before the HILLSIDE fiasco, which have uncomfortable side effects that hamper my productivity. These include tardive dyskinesia (annoying, repetitive involuntary movements), as well as paresthesias (numbness) and tremors, and total dyspareunia (no sex drive), none of which I experienced before the HILLSIDE fiasco.  Further, I have been having back problems that resulted from the stripping incident, which cause me pain and discomfort and require that I take pain relief medication frequently.  I am only able to do the most basic exercise, and have difficulty sitting comfortably. The combination of these factors curtails the number of hours I can work, and hampers my ability to concentrate. I take my medications religiously, which are prescribed by a reputable psychiatrist and psychopharmacologist, but there's only so much that meds can do for a seriously traumatized person.  If I'd known in 2001, when I made a suicide attempt, that my life would have sunk this low by 2012, I probably would've tried harder to kill myself.  I have lost faith in human decency."

154.    The Plaintiff adds: "As a result of all of this, I have inadequate earnings; without my family's assistance I would not have enough to support my ten year old son who lives with me. I used to be relatively accomplished in business and social life, but since the HILLSIDE fiasco I have lost my former self-confidence. I am impelled in pursuing this lawsuit by outrage and anguish, which is not a very healthy form of motivation. I'm afraid that HILLSIDE has done permanent psychological damage; it has made me feel like I have so little control over my life.  At age 50, I should have been at the peak of my career potential and social life.  HILLSIDE took the wind out of my sails at a critically important time of my life.  The cruel irony of this story is that I was the victim of an elaborate scam devised on the slopes of Capitol Hill in the mid 1990s, and 15 years later, a con game called Zucker HILLSIDE tricked me again.  It must have been set up to house all those pathetic individuals like me who have been suckered on The Hill."

155.    Plaintiff states emphatically: "I couldn't fight back while I was being stripped at HILLSIDE, but at least now I can strip off the veil of false professionalism that covers the Hospital's filthy undergarments of incompetence, negligence, and cruelty. I couldn't retaliate while I was being stabbed at HILLSIDE, so this court must stab the Hospital on my behalf in the only places it can feel any pain – its bank accounts and its public image.

,,

156.    "My ancestors were some of the earliest immigrants to the US.  We came to America on the Mayflower to escape oppression, and the 'new world' on this side of the Atlantic was an oasis of freedom for my family for 391 years.  If the Pilgrims came here today and saw what happened to me at HILLSIDE, I think they would turn around and sail back to England.  Our government has been rapidly returning us to tyranny, by chipping away at our human and Constitutional rights, but most U.S. citizens don't even seem to notice.  With this case, I hope I can help terminate that toxic trend... to shake Americans from their slumber of complacency."

## MISCONDUCT OF UNITED HEALTHCARE

157.    UnitedHealthcare, by refusing to terminate the Plaintiff's policy at her urgent request, participated in the conspiracy to falsely imprison her, discriminate against her on the basis of disability, and deprive her of her 1st, 4th  and 14th amendment rights.  This constituted, at a minimum, negligence, UHC continues to violate her privacy today by stating that it has the right to share any of the information that it had obtained about her health and psychiatric treatment (her "health information"), without notice or due process, and by failing to respond to her request for a list of the parties that have received her health information to date from UHC.

### V. Causes of Action

### Cause of Action for Violations of the Plaintiff's Constitutional rights

158.    Generally speaking, there are three elements required to bring an action under 42 U.S.C. §1983. The plaintiff must prove the following: (1) He or she was deprived of a specific right, privilege, or immunity secured by the Constitution or laws of the United States; (2) The alleged deprivation was committed under color of state law; and (3) The deprivation was the proximate cause of injuries suffered by the plaintiff.  The acts complained of were carried out by the aforementioned individual defendants in their official or employment capacities, with all the actual and/or apparent authority attendant thereto.

159.    The acts complained of were carried out by the aforementioned individual defendants, pursuant to the customs, usages, practices, procedures, and the rules of the corporate, government and municipal entities by which they were employed, all under the supervision of officers of these entities.  The Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective corporate, government or municipal entity, which is forbidden by the Constitution of the United States.

160.    The First Amendment states "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and

to petition the Government for a redress of grievances." The following sums up the violations of the Plaintiff's First Amendment rights: Involuntary detention/commitment prevented the Plaintiff from speaking freely to the press; being denied a court hearing prevented the Plaintiff from speaking freely to the court and the public; denial of family contact prevented the Plaintiff from speaking freely to her family; and denial of internal complaint review prevented the Plaintiff from speaking freely to a party who could independently review the unethical and illegal behavior of the HILLSIDE staff. The Plaintiff was denied not only phone communications, but also fax and Internet. She believes that this denial of communications was in retaliation for her attempts to speak with the media, and to prevent any further such efforts."

161.   Plaintiff says, "These days people are so technology-dependent that the act of confiscating their devices alone is enough to deprive them of their freedom of speech. Hardly anyone of my generation or younger carries around a written list of phone numbers anymore, or ever even uses a payphone. I probably hadn't used a payphone in 20 years prior to my HILLSIDE experience. Furthermore, I couldn't have called my son in Scotland from the payphone because I wouldn't have been able to pump quarters into the phone fast enough. When they took away my iPhone, they effectively removed part of my brain. I had practically no phone numbers memorized, because they were all stored in my devices, and the fact that they were drugging me up to the gills made this even more problematic. Seizing my devices also deprived me of due process, because that made it much more difficult for me to contact anyone who might have been able to help me obtain a hearing. There was no mention of when my devices might be returned to me. HILLSIDE's excuse for confiscation is that patients might use their phones to take photos, which they have good reason to fear, since photographs of one of their forcible stripping performances could be considered sado-masochistic pornography. But even if you accepted that explanation, it would be easy to install an app that would let you use your phone without using the camera."

162.   Not only did the Defendants deprive Plaintiff of her freedom of speech, but they also retaliated against her for her attempts to speak freely. To succeed on a First Amendment retaliation claim, a civil-rights plaintiff must demonstrate three things. First, the plaintiff engaged in protected conduct. This means that the plaintiff's speech or expression was the type traditionally covered under the First Amendment. Second, an adverse action was taken against the plaintiff that would deter "a person of ordinary firmness" from continuing to engage in that speech or conduct. Third, there is a cause-and-effect relationship between these two elements, i.e., the adverse action was motivated at least in part by the plaintiff's protected conduct. Because the Defendants who were involved in the plaintiffs unlawful detention knew that she intended to speak to the media, and broke the law to incarcerate her, and deliberately made it difficult for her to communicate with anyone outside the ward for 18 days, it is plausible that the unlawful acts and the retaliation were related. The further hostile actions that have occurred since Ms. Andersen filed this case, as described in the foregoing, such as hefty monetary fines and harassment from both NSLIJ and Nassau, have been temporally related, and are very plainly retaliatory. The aforementioned conduct resulted in a chilling effect on Plaintiff's speech, by physically preventing her from communicating with the media and public at

large; and to ultimately discredit her speech when and if it were to be uttered by making her appear 'emotionally disturbed.'

163.    The First Amendment right to criticize public officials is well-established and supported by ample case law; a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983.

164.    The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." A threshold question in Fourth Amendment jurisprudence is whether a search has occurred. If no search occurred, then the Fourth Amendment does not apply. The Supreme Court ruled that a search occurs when 1) a person expects privacy in the thing searched and 2) society believes that expectation is reasonable. Probable cause is "a reasonable belief that a person has committed a crime". The Defendants' confiscation of all of the Plaintiff's possessions, including intimate items and those that were not on HILLSIDE's written list of items disallowed on the ward, was unreasonable and excessive. Most importantly, the Defendants' forcible stripping of the Plaintiff in the guise of a search indubitably meets the definition of unreasonable search and seizure.

165.    The Defendants also violated the Plaintiff's Fourteenth Amendment rights not to be deprived of life, liberty, or property, without due process of law. The Supreme Court said this requires consideration of three distinct factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the Government's involvement. Involuntary detention and commitment prevented the Plaintiff from her entitlement to due process of law. HILLSIDE, PAPD and EMS committed Ms. Andersen under a law that didn't apply to her, failed to serve her with written notice of her status which is required under § 9.39, never allowed her a hearing to be discharged, forcibly stripped her without warning and for no legitimate reason, and forcibly injected her without warning and for no legitimate reason. These were all due process violations.

166.    The Defendants also violated the Plaintiff's right to freedom from cruel and unusual punishment, from the Eighth Amendment to the US Constitution. Normally this amendment only applies in a criminal justice context, however is applicable in this case because (1) the Port Authority Police falsely arrested the Plaintiff (although she committed no crime), handcuffed her, failed to read her Miranda rights, and transported her to HILLSIDE for detention. (2) The Defendants committed the Plaintiff to a locked ward, which was to all intents and purposes a detention facility or jail, and committed her against her will without a hearing. (3) Her captors inflicted a variety of malicious and sadistic acts on her, including corporal punishment… acts that would even be contrary to prison regulations.

167.     The United States Supreme Court set the standard in 1972 that a punishment would be considered cruel and unusual if it was too severe for the crime, if it was arbitrary, if it offended society's sense of justice, or if it was not more effective than a less severe penalty.  Forcibly stripping a disabled patient with a history of rape and PTSD, as a response to a pathetic attempt at climbing a fence, fits those three criteria. Furthermore, the conditions at HILLSIDE were worse than they are in prisons, and in detention facilities like Guantanamo Bay.

168.     The Defendants violated Plaintiff's Second Amendment rights as well.  The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  According to federal law (18 USC §922(g)(4)), the Plaintiff could now be subject to ten years imprisonment and fines of $250,000 if she possessed any firearm, because she was involuntarily committed to a mental hospital.  She feels that she should not be prevented from owning her Beretta shotgun, which she received as a gift in 2006 (and used it to date only for sporting purposes), because the Defendants broke the law by hospitalizing her unnecessarily.  Further, being a vulnerable single mother, who has been sexually and physically assaulted on more than one occasion in the past, she has good reason to want to be able to defend herself and her children at home in an emergency.  She lives in an isolated area with little security.  She was violently attacked by a gang of thugs at HILLSIDE who are still at large, and she has little means of defending herself.

169.     When an unscrupulous psychiatrist, such as the HILLSIDE Defendants, commits a non-dangerous person against his or her will, and contrary to law, such an unprincipled doctor not only deprives that patient of his liberty, but also permanently takes away his power of self-defense.  For people like the Plaintiff who need it the most, it may actually worsen underlying conditions such as depression due to the resulting stress of being disarmed.  By having incarcerated Plaintiff unfairly at HILLSIDE, the Defendants ensured that the stain of involuntary commitment on her record and her reputation would be permanent, and she might never have the means or the standing to defend herself and her family again.  This is a worse situation than having been locked in the county jail.

170.     It is important that the Court expunge the record of HILLSIDE's unlawful involuntary commitment of Ms. Andersen, so that she will no longer be at risk of violating Federal Firearms law 18 USC §922(g)(4).

## Cause of action under the ADA Act: procedural accommodations

171.     Title III of the ADA Act states: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  This includes preventing individuals with disabilities from fully and equally enjoying services through policies, practices, and procedures.

172.    To state a valid claim under title III of the ADA, a plaintiff must allege (1) that she is disabled within the meaning of the ADA; (2) that Defendants own, lease, or operate a place of public accommodation; and (3) that Defendants discriminated against her by denying her a full and equal opportunity to enjoy the services the Defendants provide.

173.    Any reasonable person would agree that (a) there are less violent forms of intervention than forcible stripping and forcible injection available to a Hospital, (b) that it would cost virtually nothing for the Hospital to modify its policies to accommodate the less violent means, and (c) it would have made the Plaintiff's stay in the Hospital less horrible if they had used less violent forms of intervention.

174.    A person is considered a "qualified individual" with a disability under the Act if that individual (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is a person "regarded as having such an impairment." 42 U.S.C. § 12102(2).  "Qualified" includes "impairments that limit major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working... other examples of major life activities include sitting, standing, lifting, and mental and emotional processes such as thinking, concentrating, and interacting with others... and major bodily functions (e.g., functions of the digestive system and bowel)".

175.    Plaintiff is considered disabled under the ADA and Rehabilitation Acts. She had her entire colon and rectum removed in two major surgeries in 2005, which causes her to become easily dehydrated without drinking water.  She endured major neurosurgery in 2009 to the spine to remove a giant sacral meningocele (cyst in the base of the spine), which causes her back pain.  The Hospital was well aware of these conditions, not only because the Plaintiff notified HILLSIDE on admission, but also because she had been treated for these conditions and others at NSLIJ over several years, so the health system already had all of her medical records.

176.    The Plaintiff's disabilities also cause her considerable discomfort.  Managing her medical care has become a time consuming job.  She has been under psychiatric care and medication for major depressive disorder since 1996, and made a suicide attempt in 2001.  Her disabilities limit her work productivity and ability to concentrate, so that she is not able to carry on a full time work schedule and sometimes is not able to work at all. Working and concentrating are "Major Life Activities" under the ADA Act, as are bodily functions such as those performed by the gastrointestinal system, which in the Plaintiff's case had been partially amputated.  She has held a disabled parking permit since 2005.

177.    The Plaintiff's disability is not an allegation conveniently concocted for a lawsuit; it is a fact, which has been well established over sixteen years.  Her status as disabled has been validated by physicians, the Department of Motor Vehicles and New York State Commission on Quality of Care and Advocacy for Persons with Disabilities (CQCAPD).

Her mental and physical health care costs have been approved and covered by several health insurance companies. She has not alleged that the Defendants rendered her disabled, only that they worsened her preexisting disabilities. Furthermore, psychiatric disabilities are just as valid under the ADA Act as physical ones, for example, paralysis or blindness. It is no different for a Hospital to discriminate under the ADA act by e.g. failing to provide a wheelchair ramp than it is to discriminate by failing to prohibit forcible strip searches of rape survivors.

178.   Because of her disabilities, the Plaintiff is not likely to "fully and equally" share in the "enjoyment" of the Defendants' stripping, stabbing, dehydrating and visual-impairment services, not to the extent that – for example – a violent, physically fit, male patient with perfect vision, an intact colon, and no rape history, might benefit from these same treatments.  It is difficult to state this without sounding melodramatic, due to the stark contrast between the innocuous wording of the law, and the inhumane nature of the acts in question, but the logical conclusions drawn from the above statement are accurate.

179.   HILLSIDE is undoubtedly a place of public accommodation for the purposes of the ADA Act.  It is open to the public, it provides its services for financial remuneration, and it is licensed by the New York State Office of Mental Health to commit patients involuntarily and provide other forms of psychiatric care.  The individual defendants "operate" this facility, by virtue of their employment by HILLSIDE as executives, psychiatrists, nurses and mental health workers.

180.   HILLSIDE defied Plaintiff's rights under the ADA and Rehabilitation Acts by failing to make accommodations for her known psychiatric disability and history of physical and sexual trauma, when several mental health workers – including very intimidating men – held her forcibly by her arms and legs while she was stripped on the order of the head nurse. The Plaintiff has demonstrated that she is both psychiatrically and physically disabled because of her history of PTSD from rape and extreme trauma, and that several authorities have recognized her as having this disability.

181.   They refused her request for a reasonable accommodation to keep her clothes on. The Defendants failed to accommodate this disability, which they obviously could have done by trying a less violent form of intervention than a gang assault and forcible injection. For example, they could have asked her about the source of her anxiety and what else they could do to mitigate it, but they did not.   They could have offered her some oral anti-anxiety medication, like Ativan®[6], which was prescribed for her on a PRN (as-needed) basis, but they did not do so.  They could have frisked her, or used a wand… and reportedly the Hospital does actually have wands available for this purpose.  Instead, they just assaulted her without warning and for no valid reason.  They repeated this infraction when they cornered and forcibly injected her over her objections a few days later.

182.   The Defendants' prevention of the Plaintiff from access to emergency services to

---

[6] Ativan® (Lorazepam), manufactured by Pfizer, is a high-potency, intermediate-duration, benzodiazepine drug, often used as a sedative.

evaluate her back for potential injury after the forcible stripping incident constituted a violation of the ADA Act, because they failed to make a reasonable accommodation for her spine condition.

183.   Medical records show that the Plaintiff's disposable contact lenses were also confiscated on admission and not returned until June 16th 2011.  She says: "I can't see properly without glasses or lenses, and can't read comfortably without reading glasses. How could I have injured myself or someone else with my soft contact lenses?"  This was yet more IIED from the Defendants.  The ability to read is also one of the Major Life Activities under the Americans with Disabilities Act. The Hospital's policy or practice of confiscating contact lenses violates the ADA act because it prevents patients who need corrective lenses from reading.  This was a discriminatory failure to provide a reasonable accommodation for the Plaintiff's needs. If the Plaintiff were completely unable to see without her lenses, she would be blind.  She is farsighted, but is able to read large type for short periods without lenses.  However, any significant and deliberate prevention by a Hospital of a patient's ability to read violates the ADA act.

184.   Bodily functions such as that of the colon are considered Major Life Activities under the Americans with Disabilities Act.  The Hospital's policy or practice of withholding drinking water from patients violates the ADA act, because it prevents patients without a colon from maintaining a safe level of hydration.  This risk must not be underestimated; it is well documented in medical literature that dehydration in a patient taking psychoactive drugs can be life-threatening.  This was a discriminatory failure to provide a reasonable accommodation for the Plaintiff's needs.  Even animal hospitals in New York are required by law to provide their patients with a constant supply of drinking water.

185.   HILLSIDE could hardly argue that modifying its policy to include instructing staff not to perform its incarceration, stripping, stabbing, dehydrating, and visual-impairment treatments on nonviolent patients, would fundamentally alter the nature of its services.  One would only have to add a line to HILLSIDE's existing policy saying something to the effect of "New York State penal code and Human Rights Laws apply within this facility." It would be unlikely for HILLSIDE to require more than a day to train its employees on this topic, so it could not be called an unreasonable accommodation.

## Cause of action under section 504 of the Rehabilitation Act of 1973

186.   The Plaintiff has argued discrimination and failure to accommodate under the ADA Act and the same arguments apply to section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794(a)) – with the exception of the federal funding requirement, which doesn't appear in the ADA Act.  To address these elements in order: (1) the Plaintiff's qualifying disability for the ADA and Rehab Acts has already been established, (2) she was qualified for benefits of treatment as a patient of the Hospital, (3) she was denied the benefits of treatment, because as a rape survivor with PTSD, and a spine problem, she could not benefit from whatever the Hospital aims to achieve through the "treatment" of

forcibly stripping and forcibly injecting patients, and (4) the benefit is part of a program receiving federal financial assistance because the Hospital is federally funded due to its large number of Medicaid and Medicare patients.  The PAPD and EMS also receive federal funding (as discussed in Section V, below).

187.   HILLSIDE's policy and practice of requiring mandatory disrobement, including the removal of clothing by force, without an individualized clinical determination of necessity, and without provision for reconsideration, reasonable accommodation or waiver, violates the prohibition in Section 504 on methods of administration that have the effect of subjecting Ms. Andersen to discrimination on the basis of handicap. 45 C.F.R. 84.4(b)(4).

188.   The municipal and law enforcement entities are individuals are equally liable under this law.  PAPD's and EMS' policy or custom of working together to falsely arrest mentally disabled people, without provision for reconsideration, reasonable accommodation or waiver, violates the prohibition in Section 504 on methods of administration that have the effect of subjecting Ms. Andersen to discrimination on the basis of handicap.  The NYPD's and DAs' policy or custom of ignoring complaints from mental patients is also discriminatory.

## Cause of Action for Intentional Infliction of Emotional Distress

189.   The tort of IIED has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  The aforementioned conduct was extreme and outrageous, and exceeded all reasonable bounds of decency.  It was committed by Defendants while acting within the scope of their employment by defendants HILLSIDE, PAPD and EMS.

190.   The reprehensible acts that the Defendants committed include: involuntary detention, forcible stripping, forcible injection, Punishment threats, lack of disability accommodations, egregious and gratuitous insensitivity, denial of notice of status, improper notice of status, Water deprivation, Improper confiscation of property, Improper prohibition of property, prohibition of internet communications, prohibition of phone communication, Denial of medical records, Discriminatory cruelty, negligent diagnosis, Negligent supervision, Denial of internal complaint review, Denial of legal counsel, negligent counsel outside area of expertise, Denial of court hearing, Denial of family contact, Negligent psychiatric practices, negligent communication with family, Denial of discharge criteria, Negligent use of discharge criteria, Negligent ID, Negligent security, Forcing unwanted treatment, and False advertising.

191.   The Plaintiff has made it apparent in the foregoing that these acts were outrageous, were intentional, caused the emotional distress, and that the distress was severe. Ms. Andersen says, "The Defendants might be able to convince a jury that a FEW of these acts were unintentionally distressing, but I don't think they could convince

a jury that ALL of them were unintentionally distressing, or that together they don't rise to the level of IIED.  For example, it might theoretically be possible for a negligent staff member to unintentionally leave her ID badge at home, however it is undeniably impossible to accidentally strip a woman, to accidentally inject her, to accidentally threaten to punish her, accidentally ridicule her disabilities, accidentally fail to serve her with improper notice of her status, accidentally lie about her medical history, accidentally confiscate all of her property, accidentally deny her computer and phone access, accidentally deny her of discharge criteria, accidentally deny her of legal counsel, and accidentally deny her of any kind of hearing whatsoever, administrative or judicial."  The Supreme Court has held that mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983.

## Cause of Action for Battery

192.   The tort of Battery requires both injury and intent to cause injury.  It is self-evident that both forcible stripping and forcible injection caused the Plaintiff injury, as explained in the foregoing.  Because these acts were perpetrated by gangs of individual Defendants plus John/Jane Does, and witnessed by others, there is no question that they were intentional.  The security camera records, when they are obtained, will provide irrefutable evidence of battery. (1) Defendant mental health workers touched plaintiff in a harmful and offensive manner, (2) they did so without privilege or consent from Plaintiff, (3) as a result of Defendants' conduct, Plaintiff has suffered physical pain and mental anguish, together with shock, fright, apprehension, embarrassment and humiliation.

## Cause of Action for Medical Malpractice and Negligence: HILLSIDE

193.   The elements of a medical malpractice claim include: (1) a legal duty to use due care (because the reprehensible acts were all committed by employees of the Hospital), (2) a breach of that duty (as in the duty of a physician/nurse/carer to patient), (3) a reasonably close causal connection between that breach and the Plaintiff's resulting injury, and (4) actual loss or damage to the Plaintiff.

194.   Dr. Brar, the psychiatrist who committed Plaintiff, unsupervised, was not licensed to practice medicine in New York State at the time.  According to official State records, this psychiatrist wasn't licensed until nearly two years later: April, 2013.  In fact, no few than four of the doctors who mistreated Plaintiff on an unsupervised basis were unlicensed, at the time of her hospitalization in June 2011.

195.   The foregoing has described enough of the gory details about each of the reprehensible acts by the Defendants to prove medical malpractice.  These reprehensible acts include but are not limited to: involuntary detention/commitment, forcible stripping, forcible injection, Punishment threats, lack of disability accommodations, egregious and gratuitous insensitivity, denial of notice of status, improper notice of status, Water deprivation, Improper confiscation of property, Improper prohibition of property, prohibition of internet communications, prohibition of phone communication, Denial of

medical records, Discriminatory cruelty, negligent diagnosis, Negligent supervision, Denial of legal counsel, negligent counsel outside area of expertise, Denial of court hearing, Denial of family contact, Negligent psychiatric practices, Denied internal complaint review, negligent communication with family, Denial of discharge criteria, Negligent use of discharge criteria, Negligent ID, Negligent security, and Forcing unwanted treatment. Plaintiff says, "One has to wonder what was going on in the HILLSIDE staff's minds (not to mention their shriveled hearts) when they committed these egregious acts, which together fit the UN's formal definition of torture."

196.    HILLSIDE, its agents, officials, doctors, nurses, physician's assistants, servants, employees, and/or independent contractors, jointly and severally, and individually, departed from good and accepted standards of medical care, and were negligent and careless in the service rendered for and on behalf of the Plaintiff, in failing to timely diagnose and render proper treatment to plaintiff; in failing to recognize that she was not emotionally disturbed and in need of involuntary confinement; in improperly and negligently documenting the Plaintiff's medical conditions on her chart on the basis of unsubstantiated hearsay; in failing to properly interpret the diagnostic tests that were performed; in failing to call for or request necessary additional diagnostic tests and studies; in failing to properly and timely obtain consults; in failing to hire a competent and efficient staff; in negligently hiring, retaining, supervising and controlling staff, doctors, nurses and other personnel; in forming a diagnosis solely based on non-medical professionals and/or staff's non expert and unprofessional lay opinion.

197.    That the defendants herein, their agents, officials, doctors, nurses, physician's assistants, servants and employees were further negligent and careless and violated accepted medical practices, medical customs and medical standards in that defendants, jointly and/or severally, failed to have an adequate, competent and/or sufficient nursing staff and/or other personnel to properly diagnose plaintiff which would have ensured his prompt and immediate release under the foreseeable circumstances; failed to have proper supervision of hospital- employed and/or affiliated physicians; failed to conform to the Joint Commission of Accreditation of Hospitals insofar as the making and/or keeping of hospital records; in failed to promulgate and/or enforce rules, regulations and guidelines as to proper psychiatric care; and failed to timely and/or properly carry out orders.

198.    That as a result of the negligence and carelessness of the defendants herein, the Plaintiff was caused to and did sustain the severe consequence of being involuntarily confined against her will for eighteen days, when there was no medical or professional basis to do so.

199.    When the Hospital's policies and procedures can be obtained through discovery, it may be possible to compare the Defendants' actual behavior with expected behavior. This may then be compared with policies and procedures from other hospitals, and with existing laws and regulations, to determine the extent of deviation from the 'standard of care'.

200.    As for the shadowy Mr. Lopez, who reportedly was working for the U.S.

Department of Defense while moonlighting as HILLSIDE's incarnation of "Nurse Ratched" from "One Flew Over the Cuckoo's Nest", it would be premature to dismiss the §1983 claims before it is determined whether he indeed was a DoD employee or agent as alleged, and if so, what his job description was.

### Cause of action for Negligence and Gross Negligence: Municipal and State Actors

201.    In addition to the medical negligence committed by HILLSIDE staff, the PAPD, EMS, and NYPD staff all committed negligence, and in some cases gross negligence as well.  They should not be entitled to qualified immunity, because a reasonably competent public official is presumed to have read of the Constitution, to understand human rights and to know the other laws governing his or her conduct.

202.    The PAPD and EMS negligently acted outside of their purview to coerce and arrest the Plaintiff without probable cause.  This was a false arrest, because they lied to her about their intentions, handcuffed her, failed to read her the Miranda rights or charge her, and coerced her into going to a detention facility, where they fully participated in the process of unlawfully imprisoning her.  When the people of New York and New Jersey authorized the Port Authority to collect tolls and aviation fees in 1921, they probably did not envision permitting the PAPD to deprive non-dangerous individuals of their Constitutional rights as well.  It is unlikely that New Yorkers intended the PA police and EMS to act as bounty hunters for local hospitals, either.  The PAPD had the Plaintiff's van towed away, to the tune of about $700, which was an unpleasant and unexpected expenditure for her; New York City (EMS) was also paid a bounty for delivery of the Plaintiff to the hospital.

203.    In the case of the PAPD and EMS, through the actions of the individual employees (Carbonaro, Corwin, Liantonio, "Frank 50", DeLia, and Wellington), went beyond ordinary negligence – these Defendants' actions were in reckless disregard for Ms. Andersen's safety and well-being, and were clearly in conscious violation of her right to safety.  It is indubitably a ministerial function (i.e. one that requires no exercise of judgment) for the MHLS lawyer Wellington to meet with a patient on a timely basis, even "immediately" as they are reportedly required to do, according to OMH.  While the PAPD and EMS employees' (Carbonaro, Corwin, Liantonio, and "Frank 50") decision to arrest and transport the Plaintiff to HILLSIDE involved some individual decision-making, and they may (or may not) have been following their policy or custom, any reasonable person should have known that it was unlawful to handcuff a nonviolent person without probable cause, and deprive that person of her liberty, due process and freedom of speech.  For them to pull a "bait and switch" trick on such a person, by telling her that she would be able to exercise her freedom of speech at the hospital, knowing full well that she would be prevented from doing so, was deceitful, and therefore unlikely to be part of their job description.  The PAPD and EMS staff's actions rose to the level of gross negligence.

204.    The NYPD has a ministerial duty to take reports, even if it isn't required to investigate each and every crime.  The Plaintiff sent a nine-page formal complaint to the

47

NYPD, and it refused to even produce a police report for her. This was not due to the actions of a single NYPD employee, either. It involved several different NYPD detectives and other employees, including Detectives O'Brien and McAuliffe, and Lieutenant Petruzzello, and two different precincts: the 112th and the 105th. Ms. Andersen called and emailed these officers several times, and went to the 105th in person, where a Jane Doe employee told her that the 112th was investigating the matter. However the latter never produced any investigation report, or even gave the Plaintiff a report number. Det. O'Brien negligently gave the Plaintiff incorrect information, saying that NYS Penal Code does not apply inside a psychiatric hospital (which is untrue, as Ms. Andersen discovered a year later). It was well within these employees' job descriptions to at least issue a police report, especially since they claimed to have been investigating. And yet, when the Plaintiff requested all of the NYPD's records pertaining to her complaint under the Freedom of Information Law, the NYPD puzzlingly responded in writing (6/17/13) that her file was empty, which smacks of a cover-up.

205.   Equally, the District Attorneys have a ministerial duty to take reports, even if it isn't required to investigate each and every crime. The Plaintiff sent detailed formal complaints to both the Nassau and Queens DAs, and personally visited the Nassau DA's office on 3/14/12. The DAs did not even respond to her complaints. The Nassau DA's office (Assistant DA Warren N. Thurer) said it didn't have jurisdiction, because HILLSIDE is located in Queens. The Plaintiff maintains that this was a red herring and the Nassau DA did have jurisdiction. Ms. Andersen pointed out that HILLSIDE is owned by NSLIJ, which is headquartered in Nassau, NSLIJ does all of the insurance approvals and billing for HILLSIDE, and HILLSIDE's employees are paid by NSLIJ, but this comment was ignored. Thurer only noted in his report that Ms. Andersen had been "unlawfully restrained"; he did not acknowledge any of the other Defendants' offenses.

206.   The DOH and CQCAPD employees, Zaloom, Smitka, Davidson, Spitzberg and Elting, have a ministerial duty to take and investigate complaints from patients. DOH's responsibility is codified in NYMHL § 33.06 "Reports of abuse or mistreatment", which states "Allegations or complaints received shall be evaluated and, if necessary, referred for appropriate corrective action, consistent with laws, regulations and procedures established for the investigation, resolution and response to incident reports to ensure the care and safety of all patients."   CQCAPD's responsibility is codified in §45 of the NYMHLs. It remains a mystery to the Plaintiff how these individuals arrived at their conclusion that there was no deviation from the so-called "standard of care", when they did in fact claim to have decided to investigate, and any reasonable human being should have seen that (1) forcible stripping and forcible injection are in the clinical records, (2) those acts violate Constitutional rights, (3) the standard of care by definition must not include unconstitutional acts, so (4) there was a deviation from the standard of care. Zaloom, Smitka, Davidson, Spitzberg and Epting should have known that if a patient reports a serious reportable event, but the hospital has not filed the appropriate form for such an event with OMH, that something is rotten in Denmark, so to speak. The "just following orders" argument would not be credible here.

## Cause of Action for Prima Facie Tort

207.    The Plaintiff claims damages on the basis that the Defendants intended to cause the Plaintiff harm and succeeded in doing so. In order to recover damages from defendant on this claim, the Plaintiff must show: (1) that defendant intentionally acted or failed to act, (2) that defendant intended that the act or failure to act would cause harm to the plaintiff or that defendant knew with certainty that the act or failure to act would cause harm to the plaintiff; (2) That the defendant's act or failure to act was a cause of plaintiff's harm; and (4) that defendant's conduct was not justifiable under all the circumstances.

208.    The medical records confirm "intramuscular injection given with support team" and Ames' Nursing Progress Note, is *prima facie* evidence of the battery inflicted in the forcible stripping incident.  The security camera records, when they are obtained through discovery, will provide further *prima facie* evidence of false arrest, battery, negligence and IIED.

## Cause of action for Negligent Hiring, Retention, and Supervision

209.    Negligent hiring and/or retention may be found where the employee (the tortfeasor) had a reputation or record that showed his/her propensity to misuse the kind of authority given by the employer, and this record would have been easily discoverable by the employer, had the employer exercised 'due diligence'.  Negligent retention occurs where a party failed to remove an employee from a position of authority or responsibility after it became apparent that the employee was in fact misusing that authority or responsibility in a way that posed a danger to others.  Negligent supervision is closely related, as it occurs where a party fails to reasonably monitor or control the actions of an employee.  A variation of negligent retention or supervision is negligent training, which arises where the employer's training of the employee fails to prevent the employee from engaging in the acts that injure the claimant, or fails to remediate a pattern of behavior which leads to an injury.

210.    Defendants HILLSIDE, the City of New York, and the PAPD, selected, hired, trained, retained, assigned and supervised all members of its staff, including the Defendants individually named in the foregoing.  Defendants were negligent and careless when it selected, hired, trained, retained, assigned, and supervised all members of its staff including the Defendants individually named above.  Due to the negligence of the defendants as set forth above, plaintiff suffered physical and mental injury, pain and trauma, together with embarrassment, humiliation shock, fright, and loss of freedom.

211.    Many examples of negligent hiring retention and supervision are described in the foregoing, in addition to the following.  Defendant Karlin was sued in 2005, in NY Supreme Court, by a plaintiff called Dennis Harris for malpractice, which was settled in Oct. 2011. HILLSIDE should have known of Karlin's propensity for abusing patients' rights. NYPD detectives did not even know that Penal Code applies in a mental hospital, which is a very fundamental gap and their education.  The same can be said of the OMH and CQCAPD employees, since the senior lawyer at OMH also did not know whether

Penal Code supplies.  PAPD employees apparently haven't been trained how and when to do an arrest properly, since they falsely arrested the Plaintiff.

212.   There were many staff in position positions of power at HILLSIDE who obviously did not have English as a mother tongue, and were not able to communicate adequately with the Plaintiff about important issues, such as Kompancaril. It was negligent for the hospital to hire and retain these people in essential roles. The Plaintiff estimates that 50% of the staff in the ward were not native English speakers, including a number of Russians, Caribbean islanders, and southeast Asians, which is not representative of the population of Long Island overall.  This lends new meaning to that old cliché supposedly uttered by crazy people: "I was abducted by aliens."  Clearly there were other potential employees in the local employment market who speak English competently and could have done the same job.

213.   Also, as mentioned in the foregoing, HILLSIDE employees were reportedly offered no continuing education in the workplace.  Plaintiff complained about the behavior of several employees and patients to the HILLSIDE staff who were in supervisory positions, and these complaints went largely unheeded.


### Cause of Action for violations of New York Mental Hygiene Laws

214.   New York Mental Hygiene Law §9.39 in no uncertain terms states that a patient MUST BE A DANGER to herself or someone else to qualify for commitment under this statute.  The exact wording is as follows: "§9.39 Emergency admissions criteria: Hospital may retain a patient for a period of fifteen days any person alleged to have a mental illness which is likely to result in serious harm to himself or others. 'Likelihood to result in serious harm' shall mean: (1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm."  The admitting psychiatrist at HILLSIDE, Dr. Brar, acknowledged in writing that Ms. Andersen was NOT a danger to herself or anyone else, but committed her anyway.  Furthermore, Dr. Brar is only a psychiatric resident, with minimal training, and should not have been allowed to do an involuntary commitment without close supervision by a more experienced doctor.

215.   The Defendants violated §9.39 a second time.  Under §9.39, another staff psychiatrist must, within 48 hours after admission, examine the patient and confirm the first doctor's finding that the patient meets the Emergency Standard.  New York State Office of Mental Health form "OMH 474" must be filled out and given to the patient, but the Defendants did not do so.  The medical records show that after 48 hours, Ms. Andersen still did not meet the two criteria for admission under § 9.39 – danger to oneself or danger to others.

216.   The Defendants violated New York Mental Hygiene Law a third time, when

Mendelowitz served the Plaintiff with a form OMH 471, "Conversion to involuntary status" under §9.27, on June 27th, 2011, which was fifteen days after admission. However, she did not meet the criteria for detention under § 9.27.  The exact wording of § 9.27 allows involuntary commitment if the "person has a mental illness for which care & treatment in a mental hospital is essential to his/her welfare; person's judgment is too impaired for him/her to understand the need for such care and treatment; as a result of his/her mental illness, the person poses a substantial threat of harm to self or others."  The form requires an explanation of why the physician believes that the patient meets the criteria for 9.27, but none was provided.  Furthermore, only one physician signed the form, whereas the law requires two signatures.  The form does not even identify the signing physician; there is only an illegible scrawl on the signature line.  Additionally, the form was incorrectly filled out, with missing information, and it was not copied to the Plaintiff's own physician, family, or anyone else.

217.   Statute 42 C.F.R. §482.13 states "Restraint and seclusion can only be used in emergency situations if needed to ensure physical safety and if less restrictive interventions have been determined to be ineffective… Seclusion means 'the involuntary confinement of a patient alone in a room or area from which the patient is physically prevented from leaving.'  Seclusion may only be used for the management of violent or self-destructive behavior." Since the Defendants restrained and secluded the Plaintiff in non-emergency situations and without attempting less restrictive interventions, they violated 42 C.F.R. §482.13.  The Plaintiff was secluded in several places, including (1) a tiny cubicle in the emergency room although it was not an emergency, (2) her bedroom during the forcible stripping episode, (3) the "quiet room" after the forcible stripping, and (3) her bedroom during the forcible injection.  Ms. Andersen was physically restrained by both female and male staff in the forcible stripping and forcible injection episodes.

218.   It is important not to fall into the trap of pretextuality; just because Ms. Andersen had been in a psychiatric hospital once before, and was being treated as an outpatient for a chronic mental health condition, does not mean she needed to be involuntarily hospitalized at HILLSIDE for eighteen days.  Pretextual psychiatric hospital admissions shouldn't – but do – happen all the time, which is theoretically why the NYMHLs exist… to protect patients.

219.   However, even if the Defendants tried to argue that they complied with §9.39, despite the fact that they didn't, it is irrelevant because §9.39 is, in and of itself, unconstitutional.  Astonishingly, §9.39 permits a psychiatric hospital to detain and incarcerate a citizen (or lawful permanent resident of the US, or anyone else) based on a subjective assessment of dangerousness by only one psychiatrist.  The doctor signing the form does not need to be very experienced; in many states, like New York, a junior (i.e. resident) doctor – like Dr. Brar – can do an involuntary admission, unsupervised.  And there does not need to be more than one doctor involved for the first two days.  This can hardly be considered due process, because the adjudication procedure is neither fair nor impartial.  In New York, after two days, a hospital only needs to produce another psychiatrist, with a minimum level of experience, who agrees with the first one, to continue to detain the patient, and at fees upwards of $3700 a day, it is well incentivized

to do that.  The detainee's only recourse is to ask the director of the hospital for a hearing, which may or may not be granted, and only after five days of asking for it.  Irreparable psychological damage can be inflicted on a vulnerable patient within the space of five days, as it was to Ms. Andersen.  NYMHLs place an inordinate amount of power in the hands of a hospital director, such as Schulman, whose incentives are plainly commercial in nature.  It endows him with the power of both judge and jury.

220.    Thus, the 9.39 statute is facially unconstitutional, and clearly its inappropriate application by HILLSIDE was unconstitutional as well.  The Court should address the constitutionality of §9.39, otherwise other cases in the same area will arise.

### Cause of Action for the Torts of False Arrest

221.    As a result of the aforesaid conduct by defendants, the Plaintiff was subjected to illegal, improper and false arrest by the PAPD Defendants, taken into custody and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

222.    As a result of the foregoing, Plaintiff's liberty was restricted for an extended period of time, she was put in fear for her safety, and she was humiliated and subjected to handcuffing and other physical restraints, without probable cause.

### Cause of Action for the Torts of Unlawful Imprisonment

223.    The Plaintiff's incarceration at HILLSIDE met the criteria for false imprisonment:  (1) willful detention; (2) without consent; and (3) without authority of law.

224.    The PAPD and HILLSIDE Defendants arrested plaintiff in the absence of probable cause and without a warrant.  As a result of the aforesaid conduct by Defendants, the Plaintiff was subjected to an illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained, confined, and incarcerated by the Defendants.  The Plaintiff was put in fear for her safety, was humiliated and subjected to handcuffing, and other physical restraints.  The aforesaid actions by the Defendants constituted a deprivation of the Plaintiff's rights.  As a result of the foregoing, the Plaintiff was deprived of her liberty, was denied fundamental rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was involuntarily confined to hospital treatment, was forced to incur substantial expenses and had her personal and professional reputation destroyed.

### Cause of Action for violation of 14 NYCRR  §27.8 and §27.9

225.    14 NYCRR  §27.8 and §27.9 are part of the New York State Mental Hygiene laws.  Section 27.8 states "Patients held on involuntary status may be given treatment over their objections only if (1) objection must be reviewed by the head of the service. (2)

Patient is allowed legal counsel or other concerned person to represent them in the formal appeal procedures. The patient or a representative of the patient can appeal to the facility director from a decision of the head of the service with respect to an objection to treatment, the director shall consider the appeal and make a decision. The decision of the director shall be communicated to the patient and the patient's representative, if any, and to the Mental Health Information Service."

226.    14 NYCRR §27.9 states "Aversive or noxious stimuli shall not be included as part of any patient's individual service plan" unless all conditions for obtaining consent are met... if patient does not consent, "an independent opinion about the patient's mental capacity must be obtained from a qualified consultant who is not an employee of the facility." The Defendants did NOT follow this procedure because, despite the Ms. Andersen's requests, they did NOT allow her legal counsel and they did NOT allow the Plaintiff to appeal to the facility director. A patient can only exhaust the administrative review process mandated by New York State Mental Hygiene Law 14 NYCRR §27.8 and §27.9 if the hospital responds to her request for an administrative review.  The forcible stripping, forcible injection, Punishment threats, Denial of legal counsel, Denial of court hearing and Denial of internal complaint review all violated sections 27.8 and 27.9.

## Cause of Action for Deceptive Business Practices and False Advertising

227.    New York General Business Statutes, Article 22-A, §349 and §350, prohibit deceptive trade practice and deceptive advertising, respectively. To state a cause of action for a violation of either statute, a plaintiff must allege: (1) an act, practice, or advertisement that was consumer oriented, (2) that said act, practice, or advertisement was misleading in a material respect, and (3) that plaintiff sustained an injury as a result of the alleged act, practice, or advertisement.  Additionally, a claim pursuant to §350 requires that a plaintiff allege reliance upon the false advertising.

228.    The Plaintiff points out the exact wording of §350-a contains the following: "In determining whether any advertising is misleading, there shall be taken into account not only representations made by statement, word, [etc], but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."  In other words, it's not only what the Defendants SAY that counts, but also what they DON'T SAY.  The Plaintiff states "If I had known I could be handcuffed, deprived of drinking water, that HILLSIDE's wards were locked, and that I could be kept there involuntarily, I absolutely would NOT have gone there.  I contend that most members of the general public would feel the same way, and that NSLIJ's advertising and PR create an image of a caring, competent, comfortable, open environment that simply doesn't exist at HILLSIDE.  I concede that I have received acceptable care in other parts of the vast NSLIJ health system, but definitely not at HILLSIDE."   The Defendant Hospital fails to mention in its advertising & PR, for example, that it has locked wards and can keep patients there involuntarily.

229.   On June 12th, 2011, the Plaintiff did not rely on any specific statement in HILLSIDE's advertising; she did not have access to any hospital's marketing materials since she was handcuffed.  She could have looked up HILLSIDE's website if the police hadn't confiscated her iPhone and iPad.  However, she relied generally on NSLIJ's reputation in the marketplace as an ethical and competent healthcare provider, which is created through its advertising and public relations, and which was communicated to her through the PA police.  Ms. Andersen's other claims support the false advertising claim.

230.   A psychiatric hospital is theoretically supposed to provide the service of improving a patient's mental health.  In fact, HILLSIDE's website (as of January 30th, 2013) states, "Directing an enormous range of services, The Zucker Hillside Hospital offers hope to and help for patients to return to normal lives."   NSLIJ's website also contains a quote from Mr. Dowling saying, "we are committed to providing you with compassionate medical care in a safe, comfortable environment… matched by a dedication to personalized healthcare… using the latest technology and treatment methods."  Therefore, since it was documented in the medical records that the Defendants performed its incarceration, stripping, stabbing, dehydrating, and visual-impairment treatments on the Plaintiff, then it follows that the Defendants consider those actions to be likely to improve a nonviolent patient's mental health, and help that patient to return to a normal life.  That is a logical assumption, because otherwise why would the Hospital document having performed those "treatments" in the Plaintiff's medical records, and then subsequently tell both the Plaintiff and OMH that it did not deviate from the standard of care?  However, most people would agree that forcibly stripping and violently injecting a nonviolent disabled female patient with a spine problem and a history of depression, PTSD and sexual/physical abuse is not likely to improve that patient's mental health or help her return to a normal life.

231.   A public website is one that is directed toward consumers at large, not specifically toward the Plaintiff or any other individual. Since NSLIJ is the dominant force in health care on Long Island, it is self-evident that thousands of members of the public rely on its advertising in choosing where to go for their care.  The Hospital also published material such as the following on its website in the section on HIPAA Privacy Policy: "The Provider will respond to your request for inspection of records within 10 days."  Since the Hospital did not respond to Ms. Andersen's request for her medical records for several months, this material constitutes false advertising.  (NB: Interestingly, this quote seems to have been removed from the Hospital's website since the second draft of the Complaint was filed.)

232.   The Hospital also published material such as the following on its website as part of its Code of Ethical Conduct: it promotes its commitment to treating patients with "compassion, understanding and respect", when obviously Ms. Andersen was not treated with any of the above.  HILLSIDE touts its commitment not to discriminate against patients based on disability, when as discussed in other sections of this document it failed to accommodate the Plaintiff's disabilities. HILLSIDE claims to "provide only care which is medically necessary and appropriate", when it has been shown that in the

Plaintiff's case much of the care was not only unnecessary and inappropriate, but also abusive.  Importantly, HILLSIDE's website is a sub-site of NSLIJ's, piggybacking on it and thereby implying that HILLSIDE's reputation and quality of care is on a part with NSLIJ's, which is untrue.  NSLIJ overall has appeared at the very top of the national hospital quality rankings but HILLSIDE has not.

233.    These false statements amount to what are known as "undisclosed dishonest business practices".  They may also be considered "bait and switch" techniques, in that they advertise a certain level of service but deliver a far inferior one.

234.    Plaintiff contends that most members of the general public would feel the same way about NSLIJ's advertising & PR if they knew about her case, and since NSLIJ is such a dominant force in healthcare on Long Island, nearly the entire population are its patients or potential patients at some point in their lives. Since NSLIJ has such a large presence on the Long Island healthcare market and HILLSIDE is part of it, it is possible that Plaintiff will have to visit HILLSIDE in the future, as will many other Long Island residents who have a mental health problem.

## VIOLATION OF NY GBL sec. 349

235.    Section 349 of New York's General Business applies to health insurers with regard to the sale and operation of health insurance policies.  United has violated this provision by administering its mental health insurance claims in a manner violating the constitution, the ADA Act and the Rehabilitation Act.  By depriving the Plaintiff of her rights, UHC was, upon knowledge and belief, able to collect more income from Medicaid than it would have if it had honored her request to terminate her insurance policy.

236.    UHS engaged in misrepresentations and omissions in the Code of Conduct that it distributes to consumers and posts on its website.  Such conduct constitutes a deceptive act or practice under New York law.

237.    UHC warns its employees in its code of conduct to hold themselves accountable for their own decisions, to practice fair dealing, and to cooperate with all investigations. It warns its employees against sharing personal information, and to share only the minimum necessary to do their jobs.

### Individual capacity claims

238.    There is no question that the individual employee Defendants are liable for denying the Plaintiff's rights, because the existence of certain unconstitutional policies or practices is no excuse for an employee's zombie-like adherence to egregiously unlawful procedures.  It is that kind of Orwellian "groupthink" – robotic conformity in a group that results in a depraved decision-making outcome – which has repeatedly resulted in war crimes and genocide in the course of history.  In addition, the individual supervisors must also be held accountable.

239.    The Second Circuit has listed five ways in which a plaintiff can establish a supervisor's personal involvement: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.  (Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

240.    Defendant Joseph M. Schulman has the ability to control hospital policy, and is therefore in a position of authority and has the power and discretion to perform potentially discriminatory acts.  As the Executive Director of HILLSIDE, he failed to train and supervise Hospital staff properly, and that this failure resulted in the incidents that violated the Plaintiff's rights.  Schulman in his executive capacity 1) created a policy under which unconstitutional and unlawful practices occurred, or allowed the continuance of such a policy, and/or 2) was grossly negligent in training and supervising subordinates who committed the wrongful acts. Therefore, Schulman in addition to the Hospital is liable for the physical, mental and emotional harm caused by the unnecessary and unlawful actions of the Defendant physicians and staff.

241.    In addition to Schulman, it is highly likely that some of the other Defendant individuals are able to influence policies and procedures. The Plaintiff contends that when the hospital reporting structure and policies can be obtained through discovery, it will be possible to fully determine to what extent each of the individual Defendants have the ability to control or influence hospital policy.   Therefore it would be premature to dismiss the claims as to Defendants Mendelowitz, Pankal, Karlin, Brar, Hanna, Ames, Kompancaril, Lopez and Mittal.

242.    The other hospital managers are responsible due to their supervisory capacities, and their deliberate indifference to the Plaintiff's complaints.  Mendelowitz and Pankal were jointly in charge of the 3 Low unit.  Kompancaril was the head nurse on duty at the time of the forcible injection incident, so Kompancaril is therefore liable due to her supervisory capacity over the employees who forcibly injected the Plaintiff.  Ames was the head nurse during the stripping incident, so she also is liable due to her supervisory capacity.

243.    The Plaintiff says, "The bottom line is this: if the individual HILLSIDE Defendants didn't deviate from their policies, then the Hospital's policies are illegal because they do not make accommodations for disabled people, and if they did deviate from the Hospital's policies, then they have been lying to OMH (NYS Office of Mental Health) and me.  Either way, Schulman and his accomplices are at fault."

244.    Defendant Lesley DeLia of the Mental Hygiene Legal Service is also individually liable due to her negligent supervision of attorney Wellington.  He failed to appear to provide the Plaintiff with legal advice until 17 days had elapsed, thereby prolonging the

Plaintiff's incarceration and depriving her of due process. According to OMH, MHLS attorneys must provide legal advice to a patient "immediately". DeLia also deliberately refused to investigate Wellington's negligence, or provide any further legal assistance after the Plaintiff was discharged.

245.    Defendant Lt. Petruzzello of the NYPD, after being informed of the violation by Det. O'Brien, and directly by the Plaintiff's formal complaint, failed to remedy the wrong, and showed deliberate indifference to Ms. Andersen's rights by failing to follow up on her complaint.

246.    Defendant Lt. Serrano of the PAPD claimed to be investigating the Plaintiff's complaint, but this process disappeared into the depths of the Port Authority, and never emerged. T.C. Carbonaro is believed to have been in a supervisory position over P.O. Corwin and Liantonio, and he and his fellow officers jointly deprived the Plaintiff of her rights.

247.    Let us take just what the Defendants refer to as "automatic disrobement", a.k.a. forcible violent stripping of clothing (hereinafter referred to as "torture") as an example of one of the "treatments" that were performed on the nonviolent Plaintiff. Even if you assume, *arguendo*, that what Defendant Ames told the Plaintiff was correct, that Hospital policy allows its staff to torture all psychiatric patients if they try to escape, it is unlikely that all patients who are hospitalized for physical ailments are also at risk of torture. For example, it is implausible that a patient would be at risk of being tortured for trying to escape the hospital, just because he had second thoughts about having an X-ray, or having a mole removed. It is a matter for discovery to compare NSLIJ's medical policies with its psychiatric ones. Torture prevents the Plaintiff, who is both physically and psychologically disabled, from "fully and equally" sharing in the "enjoyment" of NSLIJ's services (i.e. she was made to feel unsafe and uncomfortable, by staff whose care was anything but compassionate). Therefore, it follows that torture, in this context, violates the ADA Act. The Plaintiff believes she would not have been subjected to torture if she had tried to escape from a medical ward rather than a psychiatric one.

## Complaints to regulatory agencies

248.    Plaintiff filed formal complaints about HILLSIDE with the following regulatory agencies: JCAHO (Joint Commission on Accreditation of Hospitals), the Better Business Bureau, the Dept. of Health and Human Services' Office of Civil Rights, the New York State Department of Health's Office of Professional Medical Conduct, and the New York State Office of Mental Health's Commission on Quality of Care and Advocacy for Persons with Disabilities. JCAHO and the Better Business Bureau did not respond, and HHS said it is not part of their remit.

249.    The Office of Mental Health (OMH), the Commission on Quality of Care for Persons with Disabilities (CQCAPD), and the Office of Professional Medical Conduct (OPMC) defendants responded to the Plaintiff's early correspondence, but did not

respond again after she pointed out to them that her involuntary commitment by the Hospital under section 9.39 was illegal because she did not qualify for a section 9.39. § 9.39 unambiguously states that a patient must be a danger to herself or someone else to qualify for commitment under this statute. Imminent, physical dangerousness is the only consideration in § 9.39, so any other discussion of alleged symptoms or diagnoses is superfluous. The Plaintiff interprets this as OMH's, CQCAPD's and OPMC's tacit admission that this matter cannot be resolved through administrative/regulatory channels, because the Defendants did in fact deviate from the standard of care, and the Defendants did in fact lie to the regulatory agencies by saying that they did not deviate from the standard of care.

250.    The Plaintiff also complained to the NYPD in person and in writing; the NYPD refused to file a police report, so she wrote to the Queens County District Attorney to file a criminal case on March 15th, 2012. She also wrote to the CCRB (Citizens Complaint Review Board). She complained to the Mental Hygiene Legal Service about its failure to respond to requests for legal advice. The MHLS failed to respond to this complaint. The Plaintiff interprets this as MHLS' tacit admission that they were negligent in failing to meet with the Plaintiff until 17 days after she was illegally committed.

251.    The Plaintiff says, "A psychiatric patient who assaulted a nurse called Marie Sweeney in one of NSLIJ's hospitals was recently imprisoned for eleven years. The nurses' union and politicians were up in arms about the attack. However, when the tables are turned and the nurses are the attackers, as in my case – shockingly – nothing happens."

## VI. "State Action" argument

252.    For 42 U.S.C. § 1983, and its parallel jurisdictional provision, 28 U.S.C. § 1343 (3), to apply in an action which alleges the deprivation of civil rights, a defendant must be deemed to have acted under color of state law.

253.    Here, for a number of reasons, the HILLSIDE Defendants acted under "color of state law" and are thus liable to Plaintiff for violating her constitutional rights (as stated herein).

254.    At all material times, HILLSIDE performed a "public function" such as to constitute state action in committing Plaintiff involuntarily and in compelling Plaintiff to take antipsychotic drugs against her will, and is consequently subject to a § 1983 suit.

255.    In the field of mental healthcare, New York State expressly depends on the use of primarily private facilities—such as HILLSIDE—to effectuate its public policy of providing mental health treatment for those who need it.

256.    The civil commitment and treatment of the mentally ill is a "public function" in New York.

257.    The New York State Legislature has expressly stated that, as a matter of public policy, the "protection and promotion of the mental health of the people of the State [of New York] and the prevention of mental illness … are matters of public concern … [and that] [t]he state and local governments shall share responsibility … for the care, treatment, and rehabilitation of the … mentally ill." (NYMHL § 1.03).

258.    As held by the New York Court of Appeals, "By provision of the Constitution and Statute (N.Y. Const. Act. XVII, § 4; Mental Hygiene Law § 1.03 et seq.) the State is responsible for the 'care, treatment, rehabilitation, education and training of the mentally ill.'

259.    Private agencies such as HILLSIDE are expressly included among the institutions (labeled "providers of services") which are authorized by statute to participate in the governmental function of caring for the mentally disabled.

260.    The supervisory authority of the Commissioner of Mental Hygiene over the operations of existing mental health facilities, the construction of new facilities, and patient transfers from one facility to another, specifically extends to private entities.

261.    Private hospitals, moreover, are authorized to receive voluntary and involuntary admissions; they may retain patients, whether initially admitted voluntarily or involuntarily, or continued involuntary status; and they are empowered to receive emergency admissions.

262.    The pervasiveness of the state control establishment by the NYMHL over cooperating private institutions (such as HILLSIDE) is further demonstrated by numerous other provisions which do not expressly refer to private facilities.

263.    For example, the NYMHL requires that any facility wishing to qualify as a "provider of services" must obtain an operating certificate from the Commissioner, NYMHL § 13.01, which requires the Commissioner's inspection and approval of the premises, equipment and personnel of the applying facility (§ 13.05).  The Commissioner also retains the power to investigate and inspect all approved facilities (§§ 13.07-13.13) and to revoke operating certificates where appropriate (§ 13.15).  Extensive provisions are made for the protection of all patients' rights. (§§ 15.01-15.17) and for the hospitalization of the mentally ill.  (§§ 31.01-31), including both substantive and procedural safeguards for the mentally disabled.

264.    With specific reference to involuntary confinement, New York has made clear that "no individual who is or appears to be mentally disabled shall be detained, deprived by his liberty, or otherwise confined without lawful authority" under NYMHL (§ 13.19 (a)).

265.    In light of New York's declaration of public policy, statutory scheme, and extensive regulation of those private agencies—like HILLSIDE—engaged in provided

mental health services, the activities performed by HILLSIDE—in connection with its treatment of Plaintiff—constituted a "public function" sufficient to establish the requisite "state action" for Plaintiff's § 1983 claims.

266.    Indeed, the statutory scheme (as set forth in the NYMHL) expressly contemplates that in performing the public function of caring for the mentally disabled the state may utilize private entities such as HILLSIDE and its employees and agents.

267.    This is precisely what the New York State officials (FDNY-EMS and the Port Authority Police) did when they transferred Plaintiff to the care of HILLSIDE.

268.    As the NYMHL makes incontrovertibly clear, it is New York State which in effect provided the care of Plaintiff through the private institution (HILLSIDE).

269.    This mere exercise of the administrative placing prerogative did not in any way affect the State's ultimate responsibility for the well-being of Plaintiff and, consequently, the public nature of the function being performed.

270.    Furthermore, an independent basis for finding state action is the comprehensive regulatory scheme … which is persuasive and compelling evidence of the degree to which the State has insinuated itself into the actions of private hospitals such as HILLSIDE, and which effectively makes such hospitals, such as HILLSIDE, an integral part of the public operation of providing assistance.

271.    The extensive amount of state involvement with involuntary civil commitment distinguishes this activity from routine medical care.

272.    New York State is also vested with the historic *parens patriae* power, which includes the duty to protect persons under legal disabilities to act for themselves.

273.    The necessary connection between the governmental function performed by HILLSIDE and its violative activity is present in this case.

274.    It is precisely the execution by HILLSIDE of the specific conduct regulated and controlled by New York State—the involuntary commitment, continued confinement, and medical care of the mentally disabled—that is challenged by Plaintiff.

275.    New York State is involved not simply with some activity of the institution alleged to have inflicted injury upon Plaintiff (i.e., HILLSIDE), but with the precise activities that caused Plaintiff injury.

276.    Accordingly, there is a sufficiently close nexus between New York State and the challenged action of the regulated entity (i.e., HILLSIDE), so that the action of the latter should be treated as that of the State itself.

277.    Accordingly, on the specific facts of this case, the requisite state action may

properly be attributable to Defendant HILLSIDE.

278.   The fact that the Plaintiff's written complaints to various other entities were repeatedly referred back to the State Office of Mental Health emphasizes the State's responsibility for HILLSIDE's malfeasance.  This included, *inter alia,* her complaints to Attorney General Eric Schneiderman, the NYPD, the CQCAPD, and the Nassau County Medical Society.

279.   The New York Court of Appeals has also held that mentally ill patients retain a liberty interest in avoiding the unwanted administration of antipsychotic medication but that the right to reject treatment with antipsychotic medication is not absolute and under certain circumstances may have to yield to compelling State interests.

280.   For instance, in an emergency situation, when there is imminent danger to a patient or others in the vicinity, the State's police power would justify forced medication for as long as the emergency persists.

281.   A State may also rely upon its *parens patriae* interest and compel a patient to take antipsychotic medication to improve a patient's condition and facilitate her return to the community.

282.   For a State to invoke this interest, and invoke its *parents patria* power to justify the forceful administration of mind-altering drugs, a State judge must determine that the individual to whom the drugs are to be administered lacks the capacity to decide for herself whether she should take the drugs.

283.   Accordingly, for a public or private hospital to compel a non-dangerous patient to take antipsychotic drugs against her will, there must be a judicial determination of whether the patient has the capacity to make a reasoned decision with respect to the proposed administration of drugs; the determination should be made at a hearing following exhaustion of the State's administrative review procedures provided for in 14 NYCRR 27.8; this hearing should be *de novo* and the patient afforded counsel at this hearing; and the State would bear the burden of establishing by clear and convincing evidence the patient's incapacity to make a treatment decision.

284.   Here, it is incontrovertible that HILLSIDE administered antipsychotic drugs to Plaintiff upon her involuntary commitment (beginning on June 12, 2011) without conducting a judicial hearing, without affording Plaintiff counsel, and without permitting Plaintiff to exhaust her State administrative review procedures.

285.   HILLSIDE thus assumed a public function and usurped the State's proper role in balancing the Plaintiff's liberty interest to reject antipsychotic medication with the State's *parens  patria* interest in attempting to, *inter alia,* improve Plaintiff's mental condition.

286.   HILLSIDE's administering of antipsychotic drugs to Plaintiff, against her expressed will, deprived Plaintiff of her aforesaid constitutionally protected liberty

interest—the right to reject antipsychotic medications.

287.   For this reason alone, the HILLSIDE Defendants thus acted under color of State law.

288.   HILLSIDE therefore performed a public function, which is exclusively reserved to the State, in compelling Plaintiff to take antipsychotic drugs against her will.

289.   The State of New York, with respect to its provision of police and emergency services (as provided to Plaintiff), was also at all material times so far insinuated into a position of interdependence with HILLSIDE that it was a joint participant in HILLSIDE's activities.

290.   HILLSIDE and the State of New York, through its employees, have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others.

291.   State employees, namely police officers, initiate the evaluation process, and there is significant consultation with and among various mental health professionals (including psychiatrists) and the State of New York helps to develop and maintain the mental health policies of private entities (like HILLSIDE).

292.   Indeed, upon information and belief, HILLSIDE is a party to one or more contracts with New York State or its affiliated agencies or entities.

293.    HILLSIDE, likewise, received funds for holding mentally ill patients.

294.   HILLSIDE's financial motivations for keeping Plaintiff there as an inpatient were revealed after her discharge.  The Plaintiff received documentation from her insurance company that HILLSIDE was paid $66,753.04 (or $3,708.50 a day) by the Hospital.  The Hospital also charged United Healthcare $2,973 for alleged laboratory tests, the results of which did not appear in the medical records, so one can assume that they were not performed.

295.   Upon information and belief, on June 12, 2011, when British Airways contacted the Port Authority Police Department, the police officer who arrived at the scene contacted and consulted with HILLSIDE HOSPITAL, specifically "Dr. Isacs," before deciding to transport Plaintiff to HILLSIDE for evaluation and, eventually, involuntary commitment.  (See Police Report, dated Jun 12, 2011, Ex. A. hereto).

296.   Upon information and belief, Dr. Isacs recommended specifically that the Port Authority Police (and FDNY-EMS) transport Plaintiff to HILLSIDE for involuntary commitment.

297.   Upon information and belief the State's police officer would not have transported Plaintiff to HILLSIDE but for the recommendation of said Dr. Isacs to do so.

298.    HILLSIDE was a state actor in that it jointly participated with the Port Authority police in the decision to transport and involuntarily commit Plaintiff to HILLSIDE.

299.    The Supreme Court's "close nexus test" also applies to Plaintiff's case, in that it can be satisfied by the scale of federal funding to a private hospital.  Based on her observations when Plaintiff was an inpatient, it is likely that HILLSIDE receives over 50% of its income from Medicaid and Medicare, and HILLSIDE's financial statements (when they are finally obtained through discovery) should clarify this.  In fact, Plaintiff's own medical insurance at the time, which paid HILLSIDE's fees in their entirety, was a federal government sponsored Medicaid insurance plan (managed through United Healthcare).  The Centers for Medicare and Medicaid Services' (CMS), requires that hospitals adhere to their Conditions for Participation in order to obtain reimbursement, and, upon information and belief, HILLSIDE has made these assurances as well, since they were able to obtain payment for the services they provided the Plaintiff.  Furthermore, Lopez claimed to be working for the U.S. Department of Defense, which is a federal agency; if this were proved in discovery to be true, it would be yet more evidence of federal funding.

300.    In fact, HILLSIDE's receipt of federal funding is connected directly with the activity that caused the injury.  To state this as plainly as possible, (1) The Plaintiff's health insurance at the time was a Medicaid managed care plan.  (2) The Defendant hospital not only billed Medicaid (through United Healthcare) but was actually paid over $66,000 for the Plaintiff's 18 days of inpatient care.  (3) During those 18 days of incarceration, the Defendants injured the Plaintiff both physically and psychologically, so therefore (4) There was a direct connection between the federal funding and the injury.

301.    The second Supreme Court test that applies definitively in the case at hand is the test for "joint action" between the hospital and government.

302.    The PAPD officers called the Hospital from JFK, and, upon information and belief, the two parties discussed at length their plan to transport the Plaintiff to the Hospital. The Plaintiff accompanied the police officers voluntarily because they told her that she could speak with the press and obtain clearance to travel to the UK at the Hospital, and she foolishly trusted them.  This was later revealed to be false pretenses.  The police ensured that HILLSIDE staff locked the doors behind the Plaintiff and invoked section 9.39 of the NYS Mental Health Law to civilly commit her over her objections.  Since the parties (police and Hospital) collaborated in preventing the Plaintiff from leaving the Hospital and from speaking to the press, it follows that both parties were jointly responsible for the Plaintiff's involuntary commitment and violation of constitutional rights to free speech and due process.  The Defendants were operating under color of state law due to their "joint action" with the police to involuntarily detain and commit the Plaintiff.  To complete this cozy, money-making, conspiratorial, "symbiotic relationship" between government entities and the Hospital, the City of New York fire department (EMS) charged United Healthcare (despite the Plaintiff's objections that it was unnecessary because this was not an emergency situation) $592 for a glorified

taxi ride with the police officers in an ambulance – eleven miles from JFK airport to HILLSIDE.  This constitutes federal funding, because United Healthcare billed that sum to Medicaid.

303.    HILLSIDE is also a state actor because the hospital employees acting under the compulsion of, and in concert with, the Port Authority police and FDNY-EMS to detain the Plaintiff.  There was "joint action" between HILLSIDE, EMS and the PAPD.  The Plaintiff has obtained a copy of the PA police report from June 12th, 2011.  This form indicates that the Plaintiff was "evaluated by EMS", and that the police consulted with a "Dr. Isacs" (presumably located at HILLSIDE) before taking the Plaintiff to HILLSIDE for more "evaluation".  This is further documentary evidence of conspiracy for Section 1985 purposes, between the PA police and the Hospital, since it implies a continuation of the "evaluation" process from one party to the other.  The PA police delegated the State function of completing the arrest process to HILLSIDE by handcuffing a nonviolent individual without probable cause, failing to read her the Miranda warnings or make criminal charges, and delivering her to behind the locked doors of the Hospital's ER.  The latter then sealed that express or implied contract by locking the doors behind the still-handcuffed Plaintiff, and then detaining her indefinitely without serving State papers or allowing her a hearing… thereby becoming a de facto police station or jail.

304.    Therefore, this was effectively a public-private "dragnet": the Hospital authorizing the federal government (via United Healthcare) to pay the local government (FDNY-EMS and PAPD) to deceive the Plaintiff and deliver her to behind the locked doors of the Hospital, from which she could not escape.  Once incarcerated, she was prevented from leaving because the NYPD has a policy or practice of ignoring pleas for assistance from HILLSIDE patients, which the Hospital uses to its advantage to detain people indefinitely.

305.    The Port Authority calls itself "a financially self-supporting public agency" and "a municipal corporate instrumentality and political subdivision of the states of New York and New Jersey", which sounds like it occupies a gray area between a municipality, a corporation and a State entity. However, the Federal Transit Administration announced on May 23rd that it would provide $3.7 billion for Sandy relief, including $871 million for the Port Authority.  That is a lot of money, even for the PA.  To put it in perspective, this amount is approximately equivalent to the total aviation fees that the PA collects in a year from all of its airports.  If it calls itself a municipal entity, then because the Port Authority receives federal funding, it has Rehabilitation Act §504 liability, and it is possible to prove state or joint action for the purposes of §1983 and 1985 claims.  If it attempts to call itself a private entity, it is liable because it receives federal funding.  If it is a state agency, it is liable under §1983.

306.    New York State, New York City, and Nassau County have also had massive hurricane relief grants from the federal government, which would also qualify as federal funding in an argument about their liability for Rehabilitation Act §504, §1983 and 1985 claims, and it is possible to prove state or joint action.

307.    Since the events of June 2011, NSLIJ has exposed the extent of its public-private links by signing a deal for Franklin Hospital (part of NSLIJ) to provide "around-the-clock healthcare services for JFK International Airport staff and patrons" (from an NSLIJ press release, March 8th 2012), which further supports the Plaintiff's "state action" arguments.

308.    MHLS (the Mental Hygiene Legal Service (MHLS), which is an agency of the New York State Supreme Court) failed to exercise its duty to advise the Plaintiff of her legal rights and request a hearing, thereby acting in concert with HILLSIDE and the PA police to cause Plaintiff to be further detained, depriving her of her Constitutional rights to freedom of speech and due process.  MHLS' duties and responsibilities are codified in NYMHLs § 47.03 "Functions, powers and duties of the service", and the MHLS director's responsibilities are laid out in § 823.2 "Duties of the Director", including (*inter alia*) "In every case in which a hearing is requested or ordered or in which an application or petition is made to the court with regard to a patient which may or may not require a hearing, the director shall investigate the patient's case, examine the patient's records, interview the patient and also, in the discretion of the director, interview other persons having information relevant to the patient's case."  These statutes make clear that advising patients is a ministerial function of MHLS staff, not a discretionary one. Plaintiff told HILLSIDE staff repeatedly that MHLS was not responding to her requests for counsel and a hearing, and she left many phone messages for MHLS, but they failed to reply, so one can safely conclude that the Hospital and MHLS conspired to deny her of her rights.  A senior attorney at OMH told the Plaintiff that MHLS is supposed to respond "immediately" to HILLSIDE patients' pleas for assistance. Seventeen days could hardly be described as "immediate".  The MHLS delegates its state legal advisory function to Hillside by failing to respond to a patient's calls for immediate help as it is supposed to do.  Hillside takes over MHLS' state function by allowing its staff to give a patient legal advice, without sanctions.  Therefore, it is an express or implied contractual legal advisory agreement between MHLS and New York State.

309.    The fact that the imprisonment, stripping, and stabbing were all performed by groups of several people confirms the deliberateness of the acts.  They were, without a shade of doubt, intentional.

310.    The NYPD delegates law enforcement to HILLSIDE by alleging that New York Penal Code does not apply in a mental hospital, and HILLSIDE accepts that implied contractual responsibility by preventing a patient from dialing 911 when attacked, and by handling (or, more to the point, not handling) law enforcement internally.  When NYPD detectives look the other way, refusing to investigate, they effectively confirm that this relationship is reciprocal.

311.    OMH (the New York Office of Mental Health) confirmed to the Plaintiff that the risk management and security staff in "private" mental hospitals, which OMH refers to as "licensees", are under the direction of each hospital's own autonomous management. OMH blesses HILLSIDE by approving it as a "licensee", and delegates the State's power and responsibility of involuntary commitment to the Hospital.  HILLSIDE confirms its State powers by, for example, committing a patient under section 9.39 without serving

her with the required State commitment papers on admission.  The OMH staff reconfirmed this by failing to investigate the Plaintiff's complaint about bad care at HILLSIDE.  This is an express or implied contract, confirming "state action".  NB: the Defendants were required to file a "Report of serious incident" with OMH pursuant to the stripping episode, but they did not, so the Investigations department was not called to investigate. HILLSIDE's failure to file an incident report with OMH is yet another indication that it considers itself an independent law enforcement entity.

312.    The Plaintiff also filed a complaint with the New York State Department of Health's Office of Professional Medical Conduct (OPMC). The OPMC is required by law, by New York Education Law, Title VIII, Article 131-A, §§ 6530 − 6532, and Title II-A, § 230, to investigate complaints about psychiatrists such as the Defendants.  This is a purely ministerial function, as described in Title II-A, § 230, paragraph 10, in very detailed language; investigations are supposed to involve use of medical experts and interviews of clinicians, and a report must be generated.  The person in charge of investigating Ms. Andersen's complaint at OPMC was David Epting, Assistant Director of Investigations, however, Epting declined to take any disciplinary action against the doctors named in the case at hand, provide any investigation report or explain why OPMC chose not to act.  In a letter dated December 2nd, 2011, Epting only recognized the Plaintiff's complaint about Mendelowitz, and failed to mention Karlin, Pankal, Brar and Hanna; he only referred her to CQCAPD, which was an unacceptable cop-out.  He ignored her four additional letters after that date, which contained important information that he had not previously addressed.

313.    New York State Commission on Quality of Care and Advocacy for Persons with Disabilities (CQCAPD), according to its website, "serves people with mental, physical, and sensory disabilities by providing independent oversight of the quality and cost-effectiveness of services provided to individuals with mental disabilities".  Its functions, powers and duties are codified in §45.07 of the NYMHLs, and its procedures in §45.09. CQCAPD staff took Ms. Andersen's complaint, and allegedly performed an investigation, according to Davidson, and Spitzberg, its Director of Investigations. However, when the Plaintiff asked for a copy of the investigation report and correspondence under the freedom of information act, CQCAPD staff stated that there was no record of any such investigation.

314.    If a licensee and its staff indeed are permitted to do their own law enforcement, involuntary commitment, regulatory oversight, and legal advice, rather than relying on the police, OMH, CQCAPD or MHLS staff, then those governmental powers must be deemed to have been delegated to them by the State, so illegal actions by the hospital and its staff must be considered State actions for the purposes of § 1983 claims.  If OMH, CQCAPD and OPMC and their employees, as state regulatory authorities, refuse to take any disciplinary action, they confirm the delegation of that state power to the licensee. They also create a culture of noncompliance with the law that encourages abusive behavior by every one of their employees.

315.    Plaintiff's case may also meets the Supreme Court's "public function test", since

courts have described involuntary civil commitment as a power that is "quintessentially governmental".

316.    The combination of the foregoing factors may be unique among lawsuits previously brought in federal courts to date against HILLSIDE[7], in which there were no government parties involved at all except the police.  Therefore, the Defendants should be considered "state actors", and their decisions to detain Plaintiff involuntarily and force her to take antipsychotic drugs against her will should be deemed "state action".

317.    Furthermore, executives and managers like Schulman, Pankal and Mendelowitz at HILLSIDE, PAPD Lts. Serrano and Petruzzello,  and MHLS Director DeLia, have previously been found by courts to be liable for the actions of poorly trained and supervised staff.

## VII. Unanimity from Psychiatry textbooks

318.    Since Ms. Andersen's discharge from the Hospital, she has conducted a review of the major Emergency Psychiatry textbooks, which are unequivocal in damning forced patient strip searches.  Following are some excerpts from the textbooks:

319.    "Being forced to remove street clothing can be extremely disturbing and feel very unsafe for individuals who have a history of sexual abuse and trauma. These individuals may refuse to remove their clothing and ultimately engage in physical struggles as security guards attempt to strip them, reenacting their former abuse and greatly exacerbating the emotional crisis that brought them to the emergency department in the first place."

320.    "…[hospital] staff interviewed for this book almost universally expressed surprise at the pain a policy they often automatically implement causes individuals with psychiatric disabilities. These automatic policies must change, particularly when resistance or refusal leads to forcible stripping by security guards of people who may well be victims of rape or childhood sexual abuse…"

*from "Emergency Department Treatment of the Psychiatric Patient: Policy Issues and Legal Requirements." By Susan Stefan, Oxford University Press, 2006.*

321.    "…A hospital policy requiring automatic disrobement solely on the basis that a patient has a psychiatric diagnosis or is seeking psychiatric treatment is clinically unjustified, discriminatory and illegal… Flight risk is not a sufficient justification for removal of clothing."

---

[7] These cases include *Estes El v. Long Island Jewish Med. Ctr.,* No. 95 Civ. 1047, 1995 U.S. Dist. LEXIS 4752, at [S.D.N.Y., April, 12, 1995)], *Josathe v. City of New York,* No. 05 Civ. 1375, 2009 U.S. Dist. LEXIS 18163, (E.D.N.Y. March 10, 2009], *Gunthier v. North Shore Long Island Jewish Health System,* 298 F. Supp.2d 342, 348 (E.D.N.Y. 2004), and *Nedd v. Queens Hosp. Ctr.,* No. 08 Civ. 1141, 2008 U.S. Dist. LEXIS 47235, (E.D.N.Y. Juen 18, 2008).

> *from www.napas.org (National Disability Rights Network); also published in "Emergency Department Treatment of the Psychiatric Patient: Policy Issues and Legal Requirements." By Susan Stefan.*

322.   "Ironically, the patients most disturbed by the requirement to remove their clothing are often the ones who are forcibly stripped by male security guards, resulting in retraumatization (and possible legal liability).  The National Advisory Council found that flight risk is not sufficient justification for removal of clothing and that a blanket policy of automatic disrobement based solely on psychiatric diagnosis was clinically unjustified, discriminatory, and illegal…"

> *from Emergency psychiatry: principles and practice, by Rachel Lipson Glick, Jon S. Berlin, Avrim Fishkin, 2008.*

323.   "The National Advisory Council of the CPR Emergency Department Project developed standards that recommend identifying individuals in psychiatric crisis with histories of trauma, and make particular efforts to avoid inpatient admission for people with histories of trauma unless absolutely necessary. Because control is so important for people with trauma histories, inpatient admissions rarely have long-term benefits and should only be used when there is no other means to assure safety in the short term."

> *From "Recommendations to Reduce Inappropriate Inpatient Admissions", Susan Stefan, AB, M.Phil, JD, Senior Staff Attorney, Center for Public Representation, Newton, Massachusetts.*

## IX. PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff demands judgment against the Defendants on all claims.  The Plaintiff further requests:

▪ All necessary Injunctive and declaratory relief, to, *inter alia,* avert the likelihood that illegal acts of the foregoing nature will continue to be committed by the Defendants;
▪ Attorney's fees pursuant to 42 U.S.C. §1988 and other costs associated with the disbursement of this action;
▪ Plaintiff's clinical records to be sealed;
▪ Punitive damages and compensatory damages;
▪ Interest; and
▪ All other relief to which this Honorable Court may seem just, proper, or necessary.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in all issues so triable.

Dated: April 14, 2014
       Orangeburg, New York

Respectfully submitted:


KEVIN T. MULHEARN, P.C.

/S

_____
By:  Kevin T. Mulhearn (KM2301)

*Attorneys for Plaintiff*

60 Dutch Hill Road
Suite 15
Orangeburg, New York 10962
Phone No.: (845) 398-0361
Email: kmulhearn@ktmlaw.net

# EXHIBIT A

THE PORT AUTHORITY OF NY & NJ



**AIDED REPORT**                                                    PA 2696 (08-10)

INSTRUCTIONS:   To be prepared by reporting officer on assist cases that are not covered by other forms such as PA 146, PA 621, etc. Send original to claims attorney and copy to police desk.

CASE # **11837**                                              FACILITY: JFK

| Full Name | Sex | Age | Date | Time |
|---|---|---|---|---|
| LAUREN ANDERSEN | F | 49 | 6/12/11 | 1630  ☐ AM ☐ PM |

Address **1496 Laurel Hollow Rd Syosset NY 11791**   Telephone Number **516 692-0622**

P.A. Property  ☐ Yes  ☒ No    Place of Occurrence **TERMINAl #7**   Exact Location of Subject **Departures ticketing**

Other Than P.A. Property: (Name & Address of Owner or Lessee) **British Airways**

How Did Subject Arrive at Location **CAR**

Subject:  ☐ Accompanied By:   Name - **Harold Andersen (FATHER)**
          ☒ Alone             Address - **SAME AS ABOVE**

**MEDICAL DATA**

☐ No Treatment   ☒ First Aid at Scene   By **FDNY EMS 50 F**

Ambulance Called ☒ Yes ☐ No   Time **1630** ☐ AM ☐ PM   Ambulance Responded **1640** ☐ AM ☐ PM

Hospital (if hospital not listed please write-in hospital name) - select one - **L.I.J.**   Attending Physician **Dr. Isacs**

Disposition **Transport to LIJ by EMS 50 Frank**

Local Police (Identify):

Witnesses (Names & Address: If None, State So)

At TPO responded to British Airways for Female patron trying to fly without a passport. And possible EDP. Upon evaluation of EMS and request of father aided transported to LIJ for evaluation.

| Tour Commander | Date | Reporting Officer and Shield # |
|---|---|---|
| C. CARBONARO | 6-12-11 | PO CORWIN 2524 |

ENTERED